

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-5-2007

# USA v. Grier

Precedential or Non-Precedential: Precedential

Docket No. 05-1698

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"USA v. Grier" (2007). *2007 Decisions.* Paper 1552.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1552

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———

No. 05-1698

———

UNITED STATES OF AMERICA

v.

SEAN MICHAEL GRIER,

Appellant

———

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 03-cr-00284)
District Judge:  Honorable Sylvia H. Rambo

———

Argued En Banc September 13, 2006[*]

———

[*]This case was originally argued on October 25, 2005, before Judges Sloviter, Fisher, and Rosenn.  The coram was reconstituted to include Chief Judge Scirica after the death of Judge Rosenn.  On June 6, 2006, an opinion by a majority of the original panel was filed, affirming the District Court's legal conclusions, but remanding for resentencing, directing the

Before:  SCIRICA, *Chief Judge*, SLOVITER,
McKEE, RENDELL, BARRY, AMBRO,
FUENTES, SMITH, FISHER,
CHAGARES and VAN ANTWERPEN,[**] *Circuit Judges*.

(Filed February 5, 2007)

Ronald A. Krauss (Argued)
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA  17101
        *Attorney for Appellant,*
        *Sean Michael Grier*

Christian A. Fisanick
Office of United States Attorney
235 North Washington Avenue, Suite 311
P.O. Box 309
Scranton, PA  18501

---

District Court to state more fully its reasons for imposing the particular sentence.  Judge Sloviter filed a dissenting opinion on the same day.  Appellant petitioned for rehearing en banc.  The Court granted the petition and vacated the panel's judgment and opinion.

[**]Following argument, Judge Van Antwerpen took senior status on October 23, 2006, but continues to take part in this matter pursuant to Internal Operating Procedure 9.6.4.

2

Theodore B. Smith, III (Argued)
Eric Pfisterer
Kimberly A. Kelly
Office of United States Attorney
228 Walnut Street
220 Federal Building and Courthouse
P.O. Box 11754
Harrisburg, PA  17108
  *Attorneys for Appellee,*
  *United States of America*

Lawrence S. Lustberg
Michael A. Baldassare
Gibbons, Del Deo, Dolan,
 Griffinger & Vecchione
One Riverfront Plaza
Newark, NJ  07102-5497
  *Attorneys for Amicus-Appellant,*
  *National Association of Federal*
  *Defenders and National Association*
  *of Criminal Defense Lawyers*

————

OPINION OF THE COURT

————

FISHER, *Circuit Judge*.

The Supreme Court held in *United States v. Booker*, 543 U.S. 220 (2005), that facts relevant to the advisory United States Sentencing Guidelines need not be submitted to a jury. We now confirm that these facts likewise do not require proof beyond a reasonable doubt.

I.

It all started with a lost bicycle. The bike was owned by Juan Navarro but had been commandeered by his sister. She was holding it, with the support of her boyfriend, Sean Michael Grier, as a form of security against Navarro's promise to pay a cable bill. Navarro did not approve of this arrangement.

He confronted Grier and demanded the bike. Grier refused. Navarro said: "[T]here's gonna be some problems if I don't have my bike back." Grier responded: "[L]et the problem be right here and now."

Navarro swung at Grier. The punch did not connect, and the two men fell struggling to the ground. Several witnesses warned Navarro that Grier had a gun. A shot was fired. When the two men separated, Grier was holding a gun. Neither had been struck by the bullet or sustained serious injury.

Grier pointed the gun at Navarro. Navarro attempted to rush at Grier but was held back by other individuals. Grier pointed the gun upward and fired a single shot. Both men then left the scene. Grier discarded the firearm in a nearby trash can.

A police investigation ensued. Officers found the discarded gun, and a background check revealed that it had been

4

stolen.  Grier was soon arrested on state charges of aggravated assault, receiving stolen property, and unlawful possession of a firearm.  These counts were dismissed in August 2003.

Grier was subsequently charged by federal indictment with possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1), and possession of a stolen firearm, in violation of 18 U.S.C. § 922(j).  He pled guilty to the first count; the second count was dismissed pursuant to a plea agreement.

A presentence report was prepared.  It assessed a four-level enhancement pursuant to § 2K2.1(b)(5) as Grier used the firearm in connection with another felony offense,[1] namely an aggravated assault under Pennsylvania law.  *See* 18 Pa. Cons. Stat. § 2702.[2]  This finding resulted in a four-level enhancement

_____

[1]Application note 4 to U.S.S.G. § 2K2.1(b)(5) explains that the four-level enhancement for using the firearm in connection with another felony offense may be assessed "whether or not a criminal charge was brought, or conviction obtained."  U.S. Sentencing Guidelines Manual § 2K2.1(b)(5) cmt. n.4.

[2]Pennsylvania law defines aggravated assault as follows:
A person is guilty of aggravated assault if he:
> (1) attempts to cause serious bodily injury to another, or causes such injury intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; [or]

5

in Grier's offense level under the United States Sentencing Guidelines, raising it from 23 to 27, *see* U.S. Sentencing Guidelines Manual § 2K2.1(b)(5), and a fifty percent increase in the recommended imprisonment range, raising it from 84 to 105 months to 120 to 150 months, *see id.* ch. 5, pt. A. The final Guidelines range, in light of the statutory maximum sentence of ten years, *see* 18 U.S.C. § 924(a)(2), was 120 months. *See* U.S. Sentencing Guidelines Manual § 5G1.1.

Grier objected to the four-level enhancement, and a sentencing hearing was held on February 25, 2005. The parties argued briefly over the correct burden of proof. Defense counsel claimed that the reasonable-doubt standard should apply while counsel for the government maintained that a preponderance standard should govern. The District Judge agreed with the government: "I believe that the standard currently is preponderance, [and] until [I have] something more definitive from the Court of Appeals, it's what I'll use."

The only witness to testify at the hearing was Navarro. He described the altercation and stated that he had not possessed a firearm or any other weapon on his person at the time. He admitted, however, that he had not seen Grier "pull" the gun from his clothing:

> . . .
> (4) attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon . . . .

18 Pa. Cons. Stat. § 2702(a).

6

I don't know if the gun fell out [of Grier's pockets] or whatever. People was telling me that he was taking the gun out. And from there, that's when everybody tried to get the gun away from him.

Defense counsel argued that the enhancement should not apply because Grier had acted in self-defense. She also asserted that, under Pennsylvania law, Grier was guilty not of aggravated assault but of "simple assault by mutual consent," a lesser-graded version of simple assault punishable by imprisonment for one year or less. *See* 18 Pa. Cons. Stat. §§ 1104, 2701.[3] This

---

[3]Pennsylvania law defines simple assault, including the exception for mutual consent, as follows:

(a) Offense defined.–A person is guilty of assault if he:

> (1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another;
> (2) negligently causes bodily injury to another with a deadly weapon; [or]
> (3) attempts by physical menace to put another in fear of imminent serious bodily injury . . . .

(b) Grading.–Simple assault is a misdemeanor of the second degree unless committed . . . in a fight or scuffle entered into by mutual consent, in

7

crime is not considered a "felony" under the Guidelines, *see* U.S. Sentencing Guidelines Manual § 2K2.1 cmt. n.1, and would not support the enhancement.

The District Court adopted the presentence report, including the finding of aggravated assault and concomitant enhancement. It also granted a downward departure of two offense levels "in light of [Navarro's] conduct, which was partly responsible for the four[-]point enhancement." With this departure, the range of imprisonment prescribed by the Guidelines was reduced to 100 to 120 months.

The District Court recognized that the Guidelines were advisory but nevertheless imposed a term of imprisonment of 100 months, within the recommended range. It justified this sentence in a single statement: "The Court believes that 100 months is reasonable in view of the considerations of [18 U.S.C. §] 3553(a)." Defense counsel did not object to the District Court's explanation for the sentence.

This timely appeal followed. Grier argues that the District Court erred in applying a preponderance standard to facts relevant to the four-level enhancement, in finding that he had committed aggravated assault under Pennsylvania law, and in imposing sentence without fully articulating its consideration of the factors under 18 U.S.C. § 3553(a). We have jurisdiction over these claims under 18 U.S.C. § 3742(a) and 28 U.S.C.

which case it is a misdemeanor of the third degree
    . . . .
18 Pa. Cons. Stat. § 2701.

8

§ 1291. *See United States v. Cooper*, 437 F.3d 324, 327 (3d Cir. 2006).

## II.

There is no doubt that *Booker*, by rendering the United States Sentencing Guidelines advisory rather than mandatory, "brought about sweeping changes in the realm of federal sentencing." *United States v. Davis*, 407 F.3d 162, 163 (3d Cir. 2005). But there is every reason to believe that the Supreme Court intended that the practices that have guided us and other courts in the twenty years since the Guidelines were first promulgated would continue to govern sentencing in the federal courts.

Under an advisory Guidelines scheme, district courts should continue to make factual findings by a preponderance of the evidence and courts of appeals should continue to review those findings for clear error. The only change in the equation is that, at the end of the day, the district court is not bound by the recommended Guidelines range, but must impose a sentence based on all the factors articulated in § 3553(a). The court of appeals must then decide whether that final sentence is "reasonable."

### A.

The primary issue in this case is whether the Due Process Clause requires facts relevant to enhancements under the United States Sentencing Guidelines, particularly those that constitute a "separate offense" under governing law, to be proved beyond a reasonable doubt. The Supreme Court did not reach this issue in *Booker*, *see* 543 U.S. at 259, and we declined to address it in

*Cooper*, 437 F.3d at 330 & n.7.  Nevertheless, we believe that the discussion in *Booker* regarding the Jury Trial Clause of the Sixth Amendment applies with equal force to the Due Process Clause of the Fifth Amendment.  *See Apprendi v. New Jersey*, 530 U.S. 466, 484 (2000) (discussing these "associated" provisions).  Once a jury has found a defendant guilty of each element of an offense beyond a reasonable doubt, he has been constitutionally deprived of his liberty and may be sentenced up to the maximum sentence authorized under the United States Code without additional findings beyond a reasonable doubt.

1.

The constitutional guarantees of "trial . . . by an impartial jury," U.S. Const. amend. VI, and "due process of law," U.S. Const. amend. V, stand as a bulwark of individual liberty.  They interpose between the legislature and the court the community's own judgment as to the existence of a crime.  Only if a jury of an individual's peers concludes beyond a reasonable doubt that he or she committed each element of the charged offense, as defined by the legislature, may the court impose punishment.  *Booker*, 543 U.S. at 230 (citing *United States v. Gaudin*, 515 U.S. 506, 511 (1995)).

This principle is rooted in common law considerations of fundamental fairness.  *See, e.g.*, *Blakely v. Washington*, 542 U.S. 296, 301-02, 305-07, 311-12 (2004); *Apprendi*, 530 U.S. at 476-77; *Harris v. United States*, 536 U.S. 545, 556-68 (2002) (plurality opinion).  Individuals must be provided notice of the consequences of their conduct.  They must be informed of the nature of illegal acts, through legislative definition of the elements of punishable crimes, and of the possible sentences for

10

those offenses upon conviction. *See Blakely*, 542 U.S. at 301-02, 306-07, 311-12; *Apprendi*, 530 U.S. at 476-77, 489-94; *Harris*, 536 U.S. at 556-68. Under the Fifth and Sixth Amendments, individuals have a right to demand that each and every element of the alleged crime be submitted to a jury and proved beyond a reasonable doubt before sentence is imposed. It follows, then, that the fundamental question for these purposes is what facts constitute the "elements" of a "crime."

The answer was provided in *Apprendi*: the facts constituting the elements of a crime are those that increase the maximum punishment to which the defendant is exposed under governing law. *Apprendi*, 530 U.S. at 490. This conclusion was based on a simple syllogism. A crime is defined as conduct that is punishable by the state. Conduct is punishable by the state when it exposes the individual to new or additional penalties. Therefore, any conduct that exposes an individual to punishment or increases the maximum punishment to which he or she is otherwise exposed must be deemed a crime. The predicate facts of such conduct constitute the "elements" of the "crime." *Id.* at 483 & n.10 (citing *Jones v. United States*, 526 U.S. 227, 244-48 (1999)); *see also id.* at 500-01 (Thomas, J., concurring).

It is to these facts, and to these facts alone, that the rights to a jury trial and proof beyond a reasonable doubt attach. "The Fifth and Sixth Amendments ensure that the defendant 'will never get more punishment than he bargained for when he did the crime,' but they do not promise that he will receive 'anything less' than that." *Harris*, 536 U.S. at 566 (quoting *Apprendi*, 530 U.S. at 498 (Scalia, J., concurring)). Once an individual has been convicted by a jury beyond a reasonable doubt of the predicate facts of illegal conduct, triggering a

11

statutory maximum penalty, a court may impose any sentence on the individual up to that maximum. *Id.*

Judicial factfinding in the course of selecting a sentence within the permissible range does not offend the Fifth and Sixth Amendment rights to a jury trial and proof beyond a reasonable doubt. *Harris*, 536 U.S. at 556-68; *Apprendi*, 530 U.S. at 481-82 (citing *Williams v. New York*, 337 U.S. 241, 242-47 (1949)); *McMillan v. Pennsylvania*, 477 U.S. 79, 89-90 (1986). An individual who is provided such notice and is nevertheless found by a jury beyond a reasonable doubt to have engaged in illegal conduct has no grounds to complain when the maximum punishment authorized by the legislature is meted out by a judge. *See Blakely*, 542 U.S. at 304-05, 309; *Harris*, 536 U.S. at 556-68. As the Supreme Court stated in *McMillan*, "[o]nce the reasonable-doubt standard has been applied to obtain a valid conviction, 'the criminal defendant has been constitutionally deprived of his liberty to the extent that the state may confine him[,]'" in this case, the maximum allowed under Title 18 of the United States Code. *McMillan*, 477 U.S. at 92 n.8 (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976)).

2.

The decision in *Booker* instantiates these principles. In *Booker*, a jury found the defendant guilty of possession with intent to distribute at least fifty grams of cocaine base, an offense that carried a maximum sentence of life imprisonment under the United States Code. 543 U.S. at 227 (citing 21 U.S.C. § 841(a)(1), (b)(1)(a)(iii)). The United States Sentencing Guidelines, however, prescribed a base imprisonment range of 210 to 262 months. *Id.* (citing U.S. Sentencing Guidelines

Manual §§ 2D1.1(c)(4), 4A1.1). During a sentencing hearing, the trial judge found by a preponderance of the evidence that the defendant had possessed an additional 566 grams of cocaine base and had obstructed justice. *Id.* These findings increased the Guidelines imprisonment range to 360 months to life. *Id.* The judge then imposed a sentence commensurate with this range, of thirty years. *Id.*

The Supreme Court reversed. Of central importance to its conclusion was the mandatory nature of the Guidelines. *Id.* at 233-35. The Sentencing Reform Act required the district judge to impose a sentence within the "base" range recommended by the Guidelines, established solely by the facts of conviction, unless certain enumerated circumstances were found to be present. *Id.* (citing 18 U.S.C. § 3553(b)). In other words, upon conviction by a jury, the maximum punishment to which the individual was exposed was the highest point in the base range prescribed by the Guidelines. *Id.* The judge lacked authority to impose a higher sentence in the absence of additional findings of fact. *Id.*

These additional facts, under the reasoning of *Apprendi*, constituted "elements" of a "crime." By raising the recommended Guidelines range, they authorized the district judge to impose a higher sentence than would be permissible under the Sentencing Reform Act based solely on the facts of conviction. *Id.* They increased the maximum sentence to which the defendant would otherwise be exposed upon conviction by a jury. *Id.* These facts were therefore properly classified as elements of a crime, subject to the rights to a jury trial and proof beyond a reasonable doubt. *Id.* (citing *Apprendi*, 530 U.S. at 481).

13

The final sentence imposed in *Booker* was nearly ten years more than the base range prescribed by the Guidelines. *Id.* The range had been increased based on findings made by the sentencing judge, without submission to a jury. *Id.* This violated the defendant's rights under the Sixth Amendment, as defined in *Apprendi*.

This conclusion not only necessitated reversal of the defendant's sentence; it cast doubt on the constitutionality of the federal sentencing regime as a whole. *See id.* The Guidelines require that all facts relevant to sentencing be found by a judge based on information presented during a post-trial hearing. *Id.* There is no provision for a jury to make these determinations, nor any reasonable means to effect this result within the existing structure. Jury determinations are inherently incompatible with the Guidelines scheme. *Id.*

The Court resolved this problem by returning to the basis of its holding: the constitutional infirmity of the Guidelines was attributable to their mandatory application under the Sentencing Reform Act. All members of the Court agreed that, if the Guidelines were merely advisory, the Sixth Amendment problem would fall away. *Id.* at 233, 259. Facts relevant to enhancements under the Guidelines would no longer increase the maximum punishment to which the defendant is exposed, but would simply inform the judge's discretion as to the appropriate sentence. *Id.* These facts would then not be deemed "elements" of a "crime" and would not trigger the rights recognized in *Apprendi*. *Id.*

To achieve this result, the Court "sever[ed] and excise[d]" two statutory provisions: "the provision that requires

14

sentencing courts to impose a sentence within the applicable Guidelines range (in the absence of circumstances that justify a departure), *see* 18 U.S.C. § 3553(b)(1),[4] and the provision that sets forth standards of review on appeal, including *de novo* review of departures from the applicable Guidelines range, *see* [18 U.S.C.] § 3742(e).[5]" *Booker*, 543 U.S. at 259. The

---

[4]Section 3553(b)(1) provided, in pertinent part, as follows:

[T]he court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) [prescribed by the United States Sentencing Guidelines] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

18 U.S.C. § 3553(b)(1).

[5]Section 3742(e) provided, in pertinent part, as follows:
Upon review of the record, the court of appeals shall determine whether the sentence–

(1) was imposed in violation of law;
(2) was imposed as a result of an incorrect application of the sentencing guidelines;
(3) is outside the applicable guideline range, and . . . the

15

sentence departs from the applicable guideline range based on a factor that . . . does not advance the objectives set forth in section 3553(a)(2)[,] . . . is not authorized under section 3553(b)[, or] . . . is not justified by the facts of the case; or . . . the sentence departs to an unreasonable degree from the applicable guidelines range, having regard for the factors to be considered in imposing a sentence[;] . . . or

(4) was imposed for an offense for which there is no applicable sentencing guideline and is plainly unreasonable.

The court of appeals shall give due regard to the opportunity of the district court to judge the credibility of the witnesses, and shall accept the findings of fact of the district court unless they are clearly erroneous and, except with respect to determinations under subsection (3)(A) or (3)(B), shall give due deference to the district court's application of the guidelines to the facts. With respect to determinations under subsection (3)(A) or (3)(B), the court of appeals shall review de novo the district court's application of the guidelines to the facts.

16

excision of these provisions rendered the Guidelines advisory, freeing the trial judge to impose any sentence permitted under the United States Code using the calculated Guidelines range as only one of seven considered factors. *Id.* The maximum legislatively authorized punishment to which the defendant is exposed is no longer the maximum prescribed by the Guidelines; instead, it is the maximum prescribed by the United States Code. *Id.* Therefore, findings of fact relevant to the Guidelines need not be submitted to a jury. *Id.*

The Court noted that the "remainder of the Act 'function[s] independently.'" *Id.* (quoting *Ala. Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)). District courts must still conduct the full Guidelines analysis in every case. They must still resolve disputed issues of fact and explain the basis for any departures. The only change is that the final Guidelines range does not bind the district court, but merely serves as one of a number of factors to be considered in fashioning the ultimate sentence. *Id.* at 259-60. Of course, for Sixth Amendment purposes, this change makes all of the difference. *See id.*

3.

The Supreme Court in *Booker* did not address the applicability of the right to proof beyond a reasonable doubt in an advisory Guidelines system. This is easily explained: it had no reason to do so. The question presented in *Booker* was "[w]hether the Sixth Amendment is violated by the imposition of an enhanced sentence under the United States Sentencing

18 U.S.C. § 3742(e).

17

Guidelines based on the sentencing judge's determination of a fact . . . that was not found by the jury or admitted by the defendant." Petition for a Writ of Certiorari, *Booker*, 543 U.S. 220 (No. 04-104).[6] The absence of discussion of the Fifth Amendment is not an implicit recognition that the right to proof beyond a reasonable doubt applies at sentencing. Rather, it simply reflects the limited scope of the grant of certiorari.

There can be no question, in light of the holding of *Booker* and the reasoning of *Apprendi*, that the right to proof beyond a reasonable doubt does not apply to facts relevant to enhancements under an advisory Guidelines regime. Like the right to a jury trial, the right to proof beyond a reasonable doubt

---

[6]We note here that the same question was answered in *Cunningham v. California*, No. 05-6551, 2007 WL 135687 (Jan. 22, 2007), which was recently decided by the Supreme Court. *Cunningham*, like *Booker*, considered a mandatory sentencing regime under the Sixth Amendment and found that California's sentencing scheme, which required a judge to sentence a defendant to a middle range unless she conducted additional fact-finding, violated the Sixth Amendment as elucidated in *Apprendi*, *Blakely* and *Booker*. While *Cunningham* reinforces the Supreme Court's recent holdings regarding a defendant's right to a jury determination of any fact that increases his sentence beyond the statutory maximum, it does not affect our opinion in this case. The challenge before us is a Fifth Amendment challenge to an advisory sentencing scheme rather than a Sixth Amendment challenge to a mandatory sentencing scheme.

18

attaches only when the facts at issue have the effect of increasing the maximum punishment to which the defendant is exposed. *Apprendi*, 530 U.S. at 489-94. The advisory Guidelines do not have this effect. They require the district judge to make findings of fact, but none of these alters the judge's final sentencing authority. *Booker*, 543 U.S. at 233. They merely inform the judge's broad discretion. *Id.*

Post-*Booker*, the punishments chosen by Congress in the United States Code determine the statutory maximum for a crime. The Code identifies the facts necessary to establish an offense and any aggravating circumstances (e.g., significant drug quantity, use of a firearm, injury to a victim) that increase the statutory maximum punishment. These facts must be established beyond a reasonable doubt. *Apprendi*, 530 U.S. at 490. But, once these facts are found, triggering the statutory maximum, the judge may impose a sentence anywhere under that maximum without jury determinations and proof beyond a reasonable doubt. *Harris*, 536 U.S. at 565-67; *Williams*, 337 U.S. at 242-47.

By excising the provisions of the United States Code requiring mandatory application of the United States Sentencing Guidelines, the Supreme Court in *Booker* altered the constitutional impact of the Guidelines. None of the facts relevant to enhancements or departures under the Guidelines can increase the maximum punishment to which the defendant is exposed. *E.g.*, *United States v. Tannis*, 942 F.2d 196, 198 (3d Cir. 1991); *see also* U.S. Sentencing Guidelines Manual § 5G1.1. The Due Process Clause thus affords no right to have these facts proved beyond a reasonable doubt. *Harris*, 536 U.S. at 558 ("Judicial factfinding in the course of selecting a sentence

19

within the authorized range does not implicate the . . . reasonable-doubt component[] of the Fifth . . . Amendment[].").

This holding accords with the decisions of each of our sister circuits that has addressed this issue. *See, e.g.*, *United States v. Dorcely*, 454 F.3d 366, 372 (D.C. Cir. 2006); *Cirilo-Munoz v. United States*, 404 F.3d 527, 532-33 (1st Cir. 2005); *United States v. Gonzalez*, 407 F.3d 118, 125 (2d Cir. 2005); *United States v. Barton*, 455 F.3d 649, 657-58 (6th Cir. 2006); *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir. 2005); *United States v. Okai*, 454 F.3d 848, 852 (8th Cir. 2006); *United States v. Dare*, 425 F.3d 634, 642 (9th Cir. 2005); *United States v. Magallanez*, 408 F.3d 672, 685 (10th Cir. 2005); *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11th Cir. 2005).

4.

Grier rejects the rationale of these decisions and proposes a novel standard under which the right to proof beyond a reasonable doubt would attach to facts relevant to the Guidelines when those facts constitute a "separate offense." He finds support for this position in *Jones v. United States*, 526 U.S. 227 (1999), and *Apprendi*. This reliance is misplaced.

The question presented in *Jones* was whether a provision of the federal carjacking statute raising the maximum penalty for crimes involving "serious bodily injury" should be interpreted as an element of the crime, to which the right to proof beyond a reasonable doubt applies, or as a mere sentencing enhancement. 526 U.S. at 229. The Supreme Court found, based on comparisons with other state and federal provisions defining aggravated robbery and assault as separate offenses, that "Congress probably intended serious bodily injury to be an

20

element defining an aggravated form of the crime." *Id.* at 236. On this basis, it held that the fact of "serious bodily injury" must be submitted to a jury and proved beyond a reasonable doubt. *Id.* at 232-33, 251-52.

*Jones* was a statutory interpretation case. The comparison of the "serious bodily injury" provision to other, separate offenses was merely a means of gauging Congress's probable intent. *Id.* at 232-36. It was not a statement of constitutional doctrine and did not purport to base the right to proof beyond a reasonable doubt on whether the facts at issue constitute an independent crime. *Id.*

The only discussion of constitutional rights in *Jones* is in the subsidiary context of the interpretative canon of avoidance. *Id.* at 239-40. The Supreme Court noted that the "serious bodily injury" provision of the carjacking statute increased the maximum punishment to which the defendant was exposed and therefore likely implicated the defendant's rights to a jury trial and proof beyond a reasonable doubt, regardless of whether the provision was intended to operate as an "element" or an "enhancement." *Id.* at 239-52. The Court avoided the issue, however, by finding that Congress anticipated that the provision would stand as a separate "element," to which these rights undisputedly applied. *Id.* at 251-52.

There is no question of statutory interpretation here.[7] The

[7]In his brief, Grier argues that we should use the doctrine of constitutional avoidance and read § 3553(a) or, alternatively, U.S.S.G. § 6A1.3(a) to require proof beyond a reasonable doubt. The doctrine of constitutional avoidance applies "[w]here an otherwise acceptable construction of a statute would raise serious constitutional problems." *Edward D. Debartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council*, 485 U.S. 568, 575 (1988). In such instances, "the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress." *Id.* Before this canon of interpretation may be used, there must exist a doubt as to the meaning of the statute. Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." It makes no reference to any burden of proof. To read into this provision a requirement that findings be made beyond a reasonable doubt would fly in the face of the statutory language. U.S.S.G. § 6A1.3(a) likewise does not present sufficiently ambiguous language. It instructs that a court "may consider information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." The commentary that accompanies § 6A1.3 reads: "The Commission believes that use of a preponderance of evidence standard is appropriate . . . ." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. n.2. To construe § 6A1.3(a) as requiring proof beyond a reasonable doubt would be "plainly contrary to the intent of Congress." *Debartolo Corp.*, 485 U.S.

Guidelines were clearly intended by Congress to operate as sentencing factors, not as elements of a crime. The lack of clarity regarding congressional intent that compelled the Supreme Court in *Jones* to examine whether "serious bodily injury" could be analogized to an independent crime is simply not present here.

This is a constitutional case, governed by the rule of *Apprendi*: the rights to a jury trial and to proof beyond a reasonable doubt attach to those facts that increase the statutory maximum punishment to which the defendant is exposed. 530 U.S. at 490. This standard is not based upon the legislature's definition of a fact as an "element" or "enhancement," *id.* at 498-90, or upon a formalistic "multifactor parsing of statutes," *id.* at 501 (Thomas, J., concurring). Nor does it depend on whether the facts in question can be described as a "separate offense," a concept that appears nowhere in Supreme Court jurisprudence in this field except in the statutory discussion of *Jones*. 526 U.S. at 232-36. Considering whether Grier's conduct might fit within the definition of another crime is no more than what sentencing judges traditionally did under indeterminate sentencing schemes. As the Supreme Court stated in *McMillan*, there is no way to distinguish the finding of this kind of "separate offense" "from a host of other express or implied findings sentencing judges typically make on the way to passing sentence." *McMillan*, 447 U.S. at 92 n.8. The sole question under *Apprendi* is whether the fact at issue increases

at 575. The doctrine of constitutional avoidance is, therefore, inappropriate in this case.

23

the maximum punishment to which the defendant is exposed. 530 U.S. at 490, 494 ("[T]he relevant inquiry is one not of form, but of effect – does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?").

Facts relevant to application of the Guidelines – whether or not they constitute a "separate offense" – do not have this effect. *E.g.*, *Tannis*, 942 F.2d at 198; *see also* U.S. Sentencing Guidelines Manual § 5G1.1. They inform the district court's discretion without limiting its authority. They therefore do not constitute "elements" of a "crime" under the rationale of *Apprendi* and do not implicate the rights to a jury trial and proof beyond a reasonable doubt. 530 U.S. at 490.

5.

The District Court in this case concluded that the burden of proof for facts relevant to sentencing was preponderance of the evidence. This standard is suggested by the Guidelines, *see* U.S. Sentencing Guidelines Manual § 6A1.3 cmt., is not precluded by the Fifth or Sixth Amendments, *see Booker*, 543 U.S. at 259 ("the remainder of the act functions independently"), and has been approved by this Court, *see, e.g.*, *United States v. Mobley*, 956 F.2d 450, 455 (3d Cir. 1992).[8]

_____

[8]In *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990), we held that sentencing enhancements that "can fairly be characterized as a 'tail which wags the dog of the substantive offense' must be proved by 'clear and convincing evidence.'" *Id.* at 1100-01 (citing *McMillan v. Pennsylvania*, 477 U.S. 79,

We will affirm the District Court's decision to apply the preponderance standard to all facts relevant to the Guidelines, including the finding that Grier committed the offense of conviction in connection with an aggravated assault under Pennsylvania law.

B.

That the District Court applied an acceptable burden of proof does not, of course, mean that its findings of fact should be upheld. We have traditionally reviewed factual findings relevant to sentencing under a "clearly erroneous" standard. *See*, *e.g.*, *United States v. Lennon*, 372 F.3d 535, 538 (3d Cir. 2004). The parties apparently assume that the same standard should govern in this case.

However, the issue is not so clear cut. The Supreme Court in *Booker* excised subsection (e) of 18 U.S.C. § 3742, the provision of the United States Code that defined the appropriate standard of review for issues relevant to sentencing. 543 U.S. at 259. It held that appellate courts should thereafter review the

_____

88 (1986)). While we acknowledge that the statutory and constitutional underpinnings of that case may be questioned by the Supreme Court's reasoning in *Booker*, this case does not present a factually similar case to *Kikumura*. Kikumura's sentence was enhanced from 27-30 months to 30 years in prison. In this case, there was ultimately no departure from the recommended Guidelines range, as the 100-month sentence was within the initial 84- to 105-month Guidelines range. Therefore, it is not necessary for us to reach the current status of *Kikumura*.

25

ultimate sentence for "reasonableness." *Id.* at 260-63. Unfortunately, it did not specify whether the clearly erroneous standard should continue to apply to factual findings bearing on the advisory Guidelines range.

1.

Three options for a standard of review are available. First, courts of appeals could simply refuse to review factual findings relevant to the Guidelines on the ground that they do not govern the district court's final discretionary sentence. *See United States v. Mickelson*, 433 F.3d 1050, 1052-55 (8th Cir. 2006). Second, they could review factual determinations for "reasonableness," the standard suggested by *Booker* for review of the ultimate sentence. *See* 543 U.S. at 261. Third, courts could continue to review findings for "clear error." *See Lennon*, 372 F.3d at 538.

The first alternative, under which appellate courts would decline to review factual findings relevant to the Guidelines, is clearly untenable. District courts are required, under 18 U.S.C. § 3553(a), to consider the range prescribed by the Guidelines in imposing sentence on a defendant. *Id.* § 3553(a)(4); *see also Booker*, 543 U.S. at 261; *Cooper*, 437 F.3d at 329-32. The only manner by which this range can be determined is through a series of factual findings, adjusting the defendant's offense level and criminal history category. An error in these findings will result in an error in the recommended sentencing range and, thus, will necessarily impact the district court's assessment of the factors of 18 U.S.C. § 3553(a). Appellate review of the district court's factual conclusions is essential to ensure its compliance with statutory mandates. *See United States v.*

26

*Haack*, 403 F.3d 997, 1003 (8th Cir.), *cert. denied*, 126 S. Ct. 276 (2005).

The second alternative, under which courts of appeals would review findings of the district court for "reasonableness," is also unfeasible. The Supreme Court explained in *Booker* that review for "reasonableness" is meant to assess the ultimate sentence impose, to determine whether the sentencing judge gave meaningful consideration to the factors of 18 U.S.C. § 3553(a). 543 U.S. at 260-61. Nothing in *Booker* suggests that the same standard is to be applied to evaluate the quantum of evidence offered in support of a particular finding of fact, even one that played a role in the court's final sentence. Indeed, application of the "reasonableness" standard, with its broad focus on policy goals, would be incompatible with review of factual findings. *See United States v. Mashek*, 406 F.3d 1012, 1015 (8th Cir. 2005).

Review for clear error offers the sole viable approach. The Supreme Court in *Booker* excised the "clearly erroneous" standard from 18 U.S.C. § 3742(e) only because other aspects of that subsection included impermissible references to a mandatory Guidelines scheme. 543 U.S. at 260. Just as the Supreme Court interposed the "reasonableness" standard to fill in the gap for review of the ultimate sentence, the clearly erroneous standard fills in the gap for review of particular factual determinations.

Other courts of appeals have unanimously, if implicitly, adopted this approach. *United States v. Robinson*, 433 F.3d 31, 38 (1st Cir. 2005); *United States v. Castillo*, 430 F.3d 230, 238-39 (5th Cir. 2005); *United States v. Garcia*, 413 F.3d 201, 221-

27

22 (2d Cir. 2005); *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005); *United States v. Mashek*, 406 F.3d 1012, 1016 (8th Cir. 2005); *United States v. Bothun*, 424 F.3d 582, 585-86 (7th Cir. 2005); *United States v. Smith*, 424 F.3d 992, 1015 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1477 (2006); *United States v. Clark*, 415 F.3d 1234, 1246 (10th Cir. 2005); *United States v. Ebersole*, 411 F.3d 517, 536 (4th Cir. 2005), *cert. denied*, 126 S. Ct. 1142 (2006); *United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005). Indeed, we have previously suggested that the clearly erroneous standard would continue to apply post-*Booker*. *See United States v. Miller*, 417 F.3d 358, 362-63 (3d Cir. 2005) ("Nothing in *Booker* . . . necessarily calls into question the correctness of the District Court's factual findings or procedural decisions at the resentencing, or, for that matter, this court's [previous] approval thereof."); *United States v. Pojilenko*, 416 F.3d 243, 247 (3d Cir. 2005) (reviewing factual findings relevant to sentencing for clear error).

Despite the excision of subsection (e) of 18 U.S.C. § 3742, this Court will continue to review factual findings relevant to the Guidelines for clear error and to exercise plenary review over a district court's interpretation of the Guidelines. *See, e.g.*, *Robinson*, 433 F.3d at 35. "A finding is 'clearly erroneous' when[,] although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). A sentence imposed as a result of a clearly erroneous factual conclusion will generally be deemed "unreasonable" and,

28

subject to the doctrines of plain and harmless error, will result in remand to the district court for resentencing.  *E.g.*, *Robinson*, 433 F.3d at 35; *see also Booker*, 543 U.S. at 268.

2.

Grier challenges the finding in this case that he committed aggravated assault.  Aggravated assault is defined under Pennsylvania law as an "attempt[] to cause serious bodily injury to another . . . under circumstances manifesting extreme indifference to the value of human life" or an "attempt[] to cause . . . bodily injury to another with a deadly weapon."  18 Pa. Cons. Stat. § 2702(a).  An "attempt" may be found "when, with intent to commit a specific crime, [the individual] does any act which constitutes a substantial step toward the commission of that crime."  *Id.* § 901(a); *see also Commonwealth v. Hall*, 830 A.2d 537, 541-42 (Pa. 2003).

At the sentencing hearing, Navarro testified that he did not enter the fight with any weapons.  The firearm was produced in some manner during the course of the altercation, and other individuals warned Navarro that Grier had a gun.[9]  Soon

---

[9]Defense counsel argues that the statements by these bystanders were "classic hearsay."  This may be true, but the Federal Rules of Evidence do not apply at sentencing, *see* Fed. R. Evid. 1101(d)(3); *see also Kikumura*, 918 F.2d at 1099-1100, and counsel does not argue that Navarro's recollection of the statements was so unreliable as to preclude admission under the liberal standards governing these proceedings, *see* U.S. Sentencing Guidelines Manual § 6A1.3(a) ("In resolving any

thereafter, the gun discharged. When the two combatants stood up, Grier was holding the weapon, aimed at Navarro. Grier then pointed the gun toward the sky, fired a single shot, and left the scene.

The precise circumstances of the fight are matters of reasonable speculation. It is arguable – and is argued by Grier on appeal – that the record shows that the gun accidentally dropped from his pocket during the altercation, and that his subsequent actions were intended merely to dissuade Navarro from continuing the fight. But the District Court found that Grier intentionally pulled the gun from his clothing and, while the two men were on the ground, fired a shot in an attempt to harm or kill Navarro. He thereafter rose and aimed the gun once again at Navarro but, for whatever reason, decided to fire the weapon skyward and withdraw from the fight.

"Where, as here, the district court makes no independent findings of fact in relation to sentencing issues, but instead adopts the reasons set forth by the probation officer in the presentence investigation report, we view the report as containing the only findings of fact that support the court's sentencing decision." *United States v. Collado*, 975 F.2d 985, 990 (3d Cir. 1992). However, because in this case the presentence investigation report does not contain any specific

---

dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

reasons to support its finding of aggravated assault and the District Court heard testimony from the victim and did not make any further findings on the question, we will refrain from reviewing its determination regarding the aggravated assault until it has stated more explicitly how it reached Grier's sentence.

## C.

We lack a sufficient record to review Grier's sentence for "reasonableness." The touchstone of "reasonableness" is whether the record as a whole reflects rational and meaningful consideration of the factors enumerated in 18 U.S.C. § 3553(a).[10] *Cooper*, 437 F.3d at 329-32; *see also Booker*, 543

---

[10]These factors include:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed–

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the

U.S. at 261. It must be clear that the district court understood and reasonably discharged its obligation to take all of the relevant factors into account in imposing a final sentence. *E.g.*, *Cooper*, 437 F.3d at 329-32.

The record in this case is simply too sparse to allow us to conclude that the District Court honored its statutory duty.[11] The

most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission[;] . . .
(5) any pertinent policy statement . . . issued by the Sentencing Commission[;] . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

[11]An objection to the reasonableness of the final sentence will be preserved if, during sentencing proceedings, the defendant properly raised a meritorious factual or legal issue relating to one or more of the factors enumerated in 18 U.S.C. § 3553(a). *See Cooper*, 437 F.3d at 329 (citing *United States v. Cunningham*, 429 F.3d 673, 679 (7th Cir. 2005)). The

only explanation of the sentence provided by the District Court was: "The Court believes that 100 months is reasonable in view of the considerations of section 3553(a)." This statement, as a justification of the sentence, leaves much to be desired. It is devoid of substantive content and offers little assistance to an appellate tribunal reviewing the sentence.

More elaboration is necessary. The Sentencing Reform Act mandates that the District Court "consider" the factors of 18 U.S.C. § 3553(a). *Id.* The record must disclose meaningful consideration of the relevant statutory factors and the exercise of independent judgment, based on a weighing of the relevant factors, in arriving at a final sentence. *Cooper*, 437 F.3d at 329-32.

The rationale by which a district court reaches a final sentence is important. It offers the defendant, the government, the victim, and the public a window into the decision-making process and an explanation of the purposes the sentence is intended to serve. It promotes respect for the adjudicative process, by demonstrating the serious reflection and deliberation that underlies each criminal sentence, and allows for effective appellate oversight.

We will remand this case to allow the District Court to resentence the defendant. We do not suggest that the original sentence reflects anything less than the sound judgment of the

government does not argue in this case that Grier failed to preserve his challenge to the sentence imposed by the District Court.

District Judge, or that the final sentence should necessarily differ from the one previously imposed. The nature of the final sentence is, as always, a matter within the discretion of the District Court. We do ask, however, that the District Court explain its decision on the record, specifically by reference to the factors of 18 U.S.C. § 3553(a) and further elaboration on its findings regarding the factual underpinnings of the assault enhancement.

## III.

The opinion in *Booker* did not alter the burden of proof or the standard of review for findings of fact relevant to sentencing. But it did, by rendering the United States Sentencing Guidelines advisory rather than mandatory, place a premium on thorough explication of sentencing decisions. A reasoned and rational justification for a sentence is necessary to assure the parties of the fairness of the proceedings, to instill public confidence in the judicial process, and to allow for effective appellate review.

The explanation offered by the District Court does not provide us with a sufficiently detailed explanation that lends itself to effective review. It simply recites the necessity of compliance with 18 U.S.C. § 3553(a) without expressly considering the relevant statutory factors. While the original sentence was most likely the product of comprehensive and thoughtful deliberation, the record does not reflect that fact. We will remand this case to allow the District Court to reconsider the factors of 18 U.S.C. § 3553(a) on the record and then to resentence the defendant.

The judgment of sentence will be vacated and this case will be remanded to the District Court for further proceedings in accordance with this opinion.

RENDELL, *Circuit Judge*, concurring.

I agree with Judge Fisher's excellent reasoning and result. However, I write separately because I believe that due process concerns regarding the standard of proof at sentencing are minimal, if not non-existent, when the sentence is below the statutory maximum, as it was here.

Grier argues that due process requires that other potentially criminal conduct relied on by the sentencing judge to enhance his sentence must be proven beyond a reasonable doubt. This is incorrect. The Supreme Court stated in *McMillan v. Pennsylvania*, 477 U.S. 79 (1986) that "[o]nce the reasonable-doubt standard has been applied to obtain a valid conviction, 'the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him.'" *Id.* at 92 n.8 (quoting *Meachum v. Fano*, 427 U.S. 215, 224 (1976)). In other words, once convicted of a crime, the defendant can be punished to the extent punishment is allowed by statute for that crime without implicating due process.

Judge Sloviter quotes with specific emphasis Justice Thomas's partial dissent in *Booker* and his statement that "any fact that increases the sentence beyond what could have been lawfully imposed on the basis of facts found by the jury or admitted by the defendant" must be proved beyond a reasonable doubt. *United States v. Booker*, 543 U.S. 220, 319 n.6 (2005)

35

(Thomas, J., dissenting in part). Here, there was no such increase by the sentencing judge, because the Guidelines are advisory and Grier was sentenced below the statutory maximum of 120 months.

Due process requires only that the sentence for the crime of conviction not exceed the statutory maximum, and here the sentence was within that limit. The spectre of another "crime" impacting Grier's sentence would be troublesome from a due process standpoint only if we were concerned that Grier's sentence was in fact based predominantly on conduct wholly collateral to his convicted crime. This concern animated our opinion in *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990), and was explicated very clearly in Judge Rosenn's concurrence in that case.[12] As noted by Judge Fisher in the majority opinion, *supra* p. 24, n. 8, here there is no claim that the sentencing court did anything other than consider the evidence of assault as relevant conduct normally considered in

---

[12]*See Kikumura*, 918 F.2d at 1120 (Rosenn, J., concurring) (discussing Kikumura's 30-year sentence following conviction for explosives and passport offenses and stating that "because of the extreme departure involved here for the separate offense of attempted murder, it seems evident that the Government and the sentencing judge did not consider Kikumura's attempt to kill as collateral but *primary*") (emphasis in original).

connection with sentencing for the offense of conviction.[13] Due process accordingly is not implicated.

AMBRO, *Circuit Judge*, concurring in judgment.

Sean Grier is in prison in part for a crime for which he was never indicted, never tried, and never convicted. His sentence is based to some extent on a judicial finding, by a preponderance of the evidence, that he committed the crime of aggravated assault. This practice may be efficient. It may often reflect what "really" happened. But in my view it is not consistent with our Bill of Rights.[14]

---

[13]In this connection, our pre-*Booker* discussion in *United States v. Mobley*, 956 F.2d 450, 456-59 (3d Cir. 1992) of due process considerations in sentencing was correct and should not be disturbed.

[14]*See United States v. Booker*, 543 U.S. 220, 244 (2005) ("[I]n some cases jury factfinding may impair the most expedient and efficient sentencing of defendants. But the interest in fairness and reliability protected by the right to a jury trial—a common-law right that defendants enjoyed for centuries and that is now enshrined in the Sixth Amendment—has always outweighed the interest in concluding trials swiftly."); *Blakely v. Washington*, 542 U.S. 296, 313 (2004) ("[O]ur decision cannot turn on whether or to what degree trial by jury impairs the efficiency or fairness of criminal justice."); *Apprendi v. New Jersey*, 530 U.S. 466, 498 (2000) (Scalia, J., concurring) ("The founders of the American Republic were not prepared to leave

I.

With its landmark ruling in *Apprendi*, the Supreme Court began to reinvigorate an important principle: "[D]ue process and associated jury protections extend, to some degree, to determinations that go not to a defendant's guilt or innocence, but simply to the length of his sentence." 530 U.S. at 484 (brackets and internal quotation marks omitted). What our Court does today, however, confirms Justice Stevens's lament that the Supreme Court in *Booker* "effectively eliminated the very constitutional right *Apprendi* sought to vindicate." 543 U.S. at 302 (Stevens, J., dissenting in part). In response, I believe that a less manipulable rule should be set—that

---

[criminal justice] to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free."); *United States v. Kandirakis*, 441 F. Supp. 2d 282, 302 (D. Mass. 2006) (Young, J.) ("That our laws routinely require a defendant's sentence to be based upon what a judge believes an offender 'really' did, as opposed to the actual crime of which he was convicted by the jury, is nothing less than offensive—let alone unconstitutional."); 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 343–44 (1769) ("[H]owever convenient ['arbitrary methods of trial'] may appear at first, (as doubtless all arbitrary powers, well executed, are the most convenient) yet let it again be remembered, that delays, and little inconveniences in the forms of justice, are the price that all free nations must pay for their liberty in more substantial matters . . . .").

constitutional protections apply not only to those facts that authorize the "statutory maximum" (as phrased by *Apprendi*), *see* 530 U.S. at 490, but to every fact (save prior convictions) identified by the law itself as deserving of additional punishment, no matter what that fact may be called.[15]  Only in this way can the principles of *Apprendi*—followed through in

---

[15]*See United States v. Reese*, 92 U.S. 214, 232 (1875) (Clifford, J., concurring) ("[T]he indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted."); *Kandirakis*, 441 F. Supp. 2d at 303 (Young, J.) ("If the law identifies a fact that warrants deprivation of a defendant's liberty or an increase in that deprivation, such fact must be proven to a jury beyond a reasonable doubt."); Mark D. Knoll & Richard G. Singer, *Searching for the "Tail of the Dog": Finding "Elements" of Crimes in the Wake of* McMillan v. Pennsylvania, 22 SEATTLE U. L. REV. 1057, 1062–67 (1999) ("The general rule that every fact which constitutes an aggravation of the offense had to be alleged and proved to a jury beyond a reasonable doubt is reflected in numerous state court opinions and early English cases, as well as in early federal cases." (footnotes omitted) (citing 2 SIR MATTHEW HALE, HISTORIA PLACITORUM CORONAE (1736))); Hon. Boyce F. Martin, Jr., *The Cornerstone Has No Foundation: Relevant Conduct in Sentencing and the Requirements of Due Process*, 3 SETON HALL CONST. L.J. 25, 30–31 (1993) ("Once Congress creates a sentencing system which eliminates discretion and requires specific findings of 'actual criminal conduct,' it creates positive law which must abide by the Due Process Clause.").

*Blakely*, *Booker*, and, most recently, *Cunningham*[16]—be fully respected.

The concept is simple: if our society, through its law, deems a certain fact worth punishing (or warranting additional punishment), then the Constitution commands certain procedural protections attending the finding of that fact. Rather than following this principle of fundamental fairness, however, our law — by way of the Federal Sentencing Guidelines—criminalizes activity "on the cheap." Despite *Apprendi* and its progeny, we continue to allow sentencing judges, once a jury has found beyond a reasonable doubt that a defendant has committed *one* crime, then to find him guilty by a preponderance of the evidence of *other* crimes for which he was *not* tried—or worse, tried and acquitted—and to sentence him as if he had been convicted of *them* as well. In effect, we have a shadow criminal code under which, for certain suspected offenses, a defendant receives few of the trial protections mandated by the Constitution.

Yet, much as my sympathies align with the principles explained in Judge Sloviter's and Judge McKee's superb dissents, I have concluded that I am bound by Supreme Court precedent to concur in the judgment of the majority in this case. To create a sentencing process that fully carries through on the promise of *Apprendi* and *Blakely*, I believe the Supreme Court would have to overrule, at least, *McMillan v. Pennsylvania*, 477 U.S. 79 (1986) (allowing "sentencing factors" that enhance

---

[16]*Cunningham v. California*, No. 05-6551, 549 U.S. ___, 2007 WL 135687 (U.S. Jan. 22, 2007).

punishment to be proven by a preponderance of the evidence), and *Harris v. United States*, 536 U.S. 545 (2002) (reaffirming *McMillan* after *Apprendi* and again holding that judicial fact-finding by a preponderance of the evidence at sentencing passes constitutional muster).

Many, including Justice Breyer in *Harris* itself, have been unable to reconcile *McMillan* and *Harris* with the Supreme Court's holding in *Apprendi*. *See* 536 U.S. at 569–70 (Breyer, J., concurring).[17] But "it is th[e] [Supreme] Court's prerogative alone to overrule . . . its own precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997). This it has not yet done. For this reason alone, I join the result reached by the majority.[18] I do not join its opinion because, among other things, I do not agree with its suggestion that the Due Process Clause has no force in criminal sentencing.

---

[17]The majority here finds much support in *Harris* when reasoning that the *Apprendi* line of cases dictates the outcome in this case. Significantly, however, all of the majority's citations to *Harris* are from a section of that opinion that did not have the support of a majority of the Justices. Justice Breyer, *Harris*'s fifth vote, did not believe that the holding of *Harris* was consistent with *Apprendi*; he voted with the majority only because he did not agree with *Apprendi*. *See Harris*, 536 U.S. at 569–70 (Breyer, J., concurring). Given that *Apprendi* has been repeatedly reaffirmed since *Harris*, thus strengthening its *stare decisis* effect, the majority here must surely recognize the danger in relying on *Harris* for support.

[18]I also join Parts II.B and II.C of the majority opinion.

41

II.

Both the majority and dissenting opinions contend that the Supreme Court's *Apprendi* line of cases, culminating at the federal level with *Booker*, dictates the answer to the question presented here. It does not.

*Apprendi* holds that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. The majority correctly notes that *Apprendi*'s holding is rooted in the jury right of the Sixth Amendment, not the right to due process guaranteed by the Fifth, Maj. Op., *supra*, at 17–18; *Apprendi* speaks only of the reasonable-doubt standard for jury verdicts as a "companion" to the jury guarantee, *see* 530 U.S. at 478.[19] Moreover, nothing in *Apprendi*'s progeny—particularly *Blakely* and *Booker*—altered its Sixth Amendment basis. In *Blakely*, the Supreme Court provided further clarification of what was meant by *Apprendi*'s use of the term "statutory maximum," saying that it refers not to "the maximum sentence a judge may impose *after* finding additional facts, but the

[19]*See also Apprendi*, 530 U.S. at 490 ("'[I]t is unconstitutional for a legislature to remove from the jury the assessment of *facts that increase the prescribed range of penalties* to which a criminal defendant is exposed. It is equally clear that *such facts* must be established by proof beyond a reasonable doubt.'" (emphasis added, third alteration in original) (quoting *Jones v. United States*, 526 U.S. 227, 252–53 (1999) (Stevens, J., and Scalia, J., in separate concurrences)).

42

maximum he may impose *without* any additional findings." 542 U.S. at 303–04 (first emphasis added). In *Booker*, Justice Stevens's merits opinion simply took that definition and applied it to the Federal Sentencing Guidelines. 543 U.S. at 233 ("[T]here is no distinction of constitutional significance between the Federal Sentencing Guidelines and the Washington procedures at issue in [*Blakely*]."). In short, because facts found by judges led to Guidelines sentences that had "the force and effect of laws" (*i.e.*, they constituted statutory maximums under *Apprendi* and *Blakely*), the Guidelines as they stood were unconstitutional. *Id.* at 234.

Justice Breyer's majority opinion in *Booker* remedied this constitutional infirmity not by having juries find Guidelines facts, but instead by unmaking the Guidelines as statutory maximums—"sever[ing] and excis[ing]" those portions of the U.S. Code that made them binding on sentencing and appellate courts. *See* 18 U.S.C. §§ 3553(b)(1), 3742(e); *Booker*, 543 U.S. at 245, 258–65. This fix unmade the top of the Guidelines ranges as statutory maximums (which Justice Stevens, for the Court, had just held them to be), and turned the relevant focus to the maximum sentences set out in the U.S. Code. After *Booker*, then, the Sixth Amendment does not require Guidelines facts to be proven to a jury; instead, juries must find only those facts that increase the applicable maximum sentence as reflected in the U.S. Code.

Few, I suspect, disagree with this analysis. For our case, though, it is as unhelpful as it is obvious. The issue here is not what the Sixth Amendment requires, but rather what is

43

consistent with due process as protected by the Fifth Amendment.[20]

A.

Though *Apprendi* speaks only of the burden of proof *for a jury verdict* that is required by the Fifth Amendment right to due process as a "companion" to the Sixth Amendment jury right, 530 U.S. at 478, this is understandable: the Sixth Amendment is *Apprendi*'s principal focus. Predictably, no majority opinion in *Blakely* or *Booker* (which only expounded on *Apprendi*) even mentions the Fifth Amendment or due process. It is somewhat perplexing, then, that the majority here invokes "the reasoning of *Apprendi*" and "the holding of *Booker*"—both Sixth Amendment cases—to explain its Fifth Amendment due process ruling in this case. Maj. Op., *supra*, at 18. Though every fact that must be found by a jury must also be found beyond a reasonable doubt, this does not mean that those

---

[20]Though some have argued that the doctrine of constitutional avoidance counsels in favor of applying a reasonable-doubt standard in the post-*Booker* finding of Guidelines facts, *see, e.g.*, Memorandum from Steven T. Wax and Stephen R. Sady to Federal Public Defenders (Jan. 31, 2005), *at* http://www.federaldefenders.org/blog_doubtredux.pdf, I agree with the majority that the doctrine does not apply here, *see* Maj. Op., *supra*, at 22–23 n.7. Though Judge Sloviter argues that the comment to § 6A1.3 in the Guidelines is inapplicable to this case, Dis. Op., *infra*, at 80–82 (Sloviter, J., dissenting), I consider that policy statement to be directly on point, thus precluding invocation of the doctrine.

44

facts *not* required to be found by a jury do *not* have to be found beyond a reasonable doubt. The Supreme Court demonstrated long ago that the Fifth Amendment sometimes requires application of the reasonable-doubt standard to facts not found by a jury. *See In re Winship*, 397 U.S. 358, 359–60, 365–68 (1970) (holding on due process grounds that findings in a juvenile criminal proceeding must be found beyond a reasonable doubt, even though not determined by a jury).

While I believe the majority's holding will yield a result consistent with Supreme Court precedent in most cases, its reasoning, which intimates that *Booker*'s Sixth Amendment holding addresses and solves all due process issues relating to the burden of proof for Guidelines facts, is too sweeping. *See* Maj. Op., *supra*, at 19 ("The Due Process Clause . . . affords *no right* to have [Guidelines facts] proved beyond a reasonable doubt." (emphasis added)). More importantly, it is also inconsistent with *McMillan*, which, unlike *Booker*, provides the most complete answer to the issue presented here.

In *McMillan*, the Supreme Court upheld a Pennsylvania statute that mandated a minimum term of imprisonment upon a judicial finding, by a preponderance of the evidence, that the defendant "'visibly possessed a firearm' during the commission of the [underlying] offense." 477 U.S. at 81. The Court rejected the defendant's contention that due process required the finding of a sentencing factor be made on a heightened standard of proof (either proof beyond a reasonable doubt or by clear and convincing evidence). *Id.* at 91. Explaining its decision, the Court reasoned that "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all," and saw "nothing in Pennsylvania's scheme that would

45

warrant constitutionalizing burdens of proof at sentencing." *Id.* at 91–92. It noted the undeniable constitutionality of a sentencing scheme where "the legislature had simply directed the court to *consider* visible possession in passing sentence." *Id.* at 92 (emphasis in original). Given this, there was no reason "why the due process calculus would change simply because the legislature has seen fit to provide sentencing courts with additional guidance." *Id. McMillan*, therefore, provides that facts relevant only to sentencing must be proven only by a preponderance of the evidence—if a particular standard is required at all.

In *Apprendi*, decided 14 years after *McMillan*, the Supreme Court addressed the viability of that holding: "The principal dissent accuses us of today 'overruling *McMillan*.' We do not overrule *McMillan*. We limit its holding to cases that do not involve the imposition of a sentence more severe than the statutory maximum for the offense established by the jury's verdict . . . ." 530 U.S. at 487 n.13. Two years later, in *Harris*, the Court specifically took up the question of "whether *McMillan* stands after *Apprendi*" and reaffirmed it. 536 U.S. at 550, 568. Necessarily, therefore, the Fifth Amendment (pursuant to *McMillan*) must protect the finding of some facts below the statutory maximum, even if the Sixth Amendment (pursuant to *Apprendi*) does not.

For the federal system (and this case), this is where *Booker* becomes relevant. Even after *Apprendi*, everyone assumed that the "statutory maximum" of which it spoke referred to the maximum sentence set out in the U.S. Code. *See* Dis. Op., *infra*, at 111 (McKee, J., dissenting) (citing *United States v. Leahy*, 438 F.3d 328, 345 & n.16 (3d Cir. 2006)

46

(McKee, J., dissenting) (citing cases)). The logic of *Blakely* suggested that this assumption was not correct,[21] and Justice Stevens's merits opinion in *Booker* confirmed as much—the top of a *mandatory* Guidelines range constituted a statutory maximum, the determinative facts of which must be found by a jury beyond a reasonable doubt. Just as soon as Justice Stevens's merits opinion in *Booker* declared the Federal Sentencing Guidelines unconstitutional, however, Justice Breyer ushered them out of "*Apprendi*-land"[22] to constitutional safety. They are now "advisory" and no longer constitute statutory maximums as defined in *Apprendi* and *Blakely*.[23]

---

[21]*See* John Gleeson*, The Road to* Booker *and Beyond: Constitutional Limits on Sentence Enhancements*, 21 TOURO L. REV. 873, 882–83 (2006) ("From the perspective of the lower federal courts, *Blakely* might as well have said, 'We hold that the statutory maximum sentence is not the statutory maximum sentence.'"); Kevin R. Reitz*, The New Sentencing Conundrum: Policy and Constitutional Law at Cross-Purposes*, 105 COLUM. L. REV. 1082, 1091 (2005) ("Here was the huge surprise in *Blakely*: that a guideline presumption nested within broader statutory parameters should itself be understood as a statutory maximum.").

[22]*Ring v. Arizona*, 536 U.S. 584, 613 (2002) (Scalia, J., concurring).

[23]Judge McKee makes a powerful argument that the Guidelines' continued significance in federal sentencing nevertheless implicates the holdings of *Apprendi* and *Blakely*.

Therefore, Justice Breyer's opinion in *Booker*, which

---

Dis. Op., *infra*, Part I.A (McKee, J., dissenting). Though he disavows any attempt to "undermine *Booker*," Dis. Op., *infra*, at 117 n.52 (McKee, J., dissenting), his argument accomplishes just that. Its logic is that "considering" the Guidelines—as required by *Booker*'s remedial opinion—renders them just as essential to (and determinative of) a defendant's punishment as they were pre-*Booker*. In making this case, Judge McKee has good company. *See United States v. Henry*, No. 04-3076, ___ F.3d ___, 2007 WL 79011, at *11 (D.C. Cir. Jan. 12, 2007) (Kavanaugh, J., concurring) (noting that "current federal sentencing practices may be in tension with the Constitution . . . because the current system—in practice—works a lot like the pre-*Booker* system"); *Kandirakis*, 441 F. Supp. 2d at 289–99 (Young, J.) ("[T]he Guidelines—and their judge-made factual findings—are still the driving force behind federal sentencing."); Michael W. McConnell, *The* Booker *Mess*, 83 DENVER U. L. REV. 665, 677 ("The jury verdict is no more consequential after *Booker* than before."). Indeed, Justice Scalia made the same point in his dissent to *Booker*'s remedial opinion. *See* 543 U.S. at 311–13 (predicting that *Booker*'s remedy would create *de facto* mandatory Guidelines). The reality is, however, the same Court to strike down the judge-based, mandatory Guidelines system as unconstitutional also issued the remedy: a judge-based, advisory Guidelines scheme. No matter how compelling Judge McKee's reasoning may be, it must fail, as it cannot be unconstitutional under current doctrine for a sentencing judge to do exactly what the Supreme Court has instructed be done.

remedied the Guidelines' *Sixth* Amendment infirmity, put federal sentencing with regard to the *Fifth* Amendment back where it was before Justice Stevens's merits opinion in *Booker* was decided. And as explained above, *Apprendi* and *Harris* made clear that *McMillan* still sets out the Fifth Amendment rule applicable to the burden of proof for sentencing factors, which generally is a preponderance of the evidence. Technically, therefore, it is not *Apprendi*, *Blakely*, or *Booker* that solve the due process question here, as suggested by the majority. Instead, it is *McMillan*.[24]

---

[24]I must also, therefore, respectfully disagree with my dissenting colleagues, who argue that *Apprendi* and *Blakely* operate post-*Booker* to require proof beyond a reasonable doubt for the Guidelines fact at issue here—whether Grier committed an aggravated assault. That the Guidelines are no longer mandatory makes all the constitutional difference as far as *those cases* are concerned. As Justice Stevens's merits opinion in *Booker* said, "If the Guidelines as currently written could be read as merely advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment." 543 U.S. at 233; *see also Apprendi*, 530 U.S. at 481. That is exactly what Justice Breyer's remedial opinion in *Booker* purported to do. *But see supra*, note 23.

Both Judge Sloviter and Judge McKee highlight the Supreme Court's statement in *Blakely* that "'the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*'" in arguing that

*Apprendi* can apply under the statutory maximum. Dis. Op., *infra*, at 95 (Sloviter, J., dissenting) (quoting *Blakely*, 542 U.S. at 303 (emphasis in *Blakely*)); *see also* Dis. Op., *infra*, at 108 (McKee, J., dissenting). I believe, however, that they overlook a critical qualifier in that statement: the word "may." For only if the Guidelines are mandatory, as they were pre-*Booker*, is *Blakely* violated. Under that system, a judge could not sentence a defendant above the Guidelines range associated with the base offense level for the offense of conviction *without finding additional facts*. But because Justice Breyer's remedial opinion in *Booker* "sever[ed] and excis[ed]" the statutory provisions making the Guidelines mandatory on sentencing and appellate courts, a judge "may" impose any sentence made available by the statute of conviction, *regardless* of any additional facts he may or may not find. The jury verdict alone now sets the bounds of a judge's sentencing discretion; therefore, *Blakely* does not decide this case.

Nothing in the Supreme Court's recent *Cunningham* decision alters this conclusion. *Cunningham*, like the merits decision in *Booker*, is nothing more than a simple application of *Blakely*—this time to California's determinate sentencing law. *See Cunningham*, 2007 WL 135687, at *10 n.10 ("California's [law] . . . resembles pre-*Booker* federal sentencing in the same ways Washington's sentencing system did [in *Blakely*] . . . ."). Thus, *Cunningham* does not inform the law applicable here in any material way, as Judge Sloviter and Judge McKee argue. *See* Dis. Op., *infra*, at 91–92, 97 (Sloviter, J., dissenting); Dis. Op., *infra*, Part IV (McKee, J., dissenting).

Judge Sloviter argues at length that *Jones v. United*

*States*, 526 U.S. 227 (1999), compels the conclusion she reaches. *See* Dis. Op., *infra*, at 84–89 (Sloviter, J. dissenting). Her argument is that because (1) there would have been "grave and doubtful constitutional questions" in *Jones* if the statute in that case were interpreted other than how it was (*i.e.*, that it established three separate crimes), *Jones*, 526 U.S. at 239, and (2) that "[t]he *Jones* factual scenario does not differ markedly from that presented in this case," Dis. Op., *infra*, at 85 (Sloviter, J., dissenting), the Constitution thus requires that separate-crime sentencing enhancements be proven beyond a reasonable doubt.

It is not debatable, though, that *Jones* employed the doctrine of constitutional avoidance to reach its result. *See Jones*, 526 U.S. at 251–52; *see also Cunningham*, 2007 WL 135687, at *7. That doctrine "is not a method of adjudicating constitutional questions by other means. Indeed, one of [its] chief justifications is that it allows courts to *avoid* the decision of constitutional questions." *Clark v. Martinez*, 543 U.S. 371, 381 (2005) (citations omitted, emphasis in original). Therefore, Judge Sloviter's reliance on *Jones* is misplaced, for that case did not answer *any* constitutional questions. Rather, those difficult questions were answered later—in *Apprendi*, *Blakely*, and *Booker*. *See Booker*, 543 U.S. at 237 (noting that concerns over modern sentencing practices "led us to the answer first *considered* in *Jones* and *developed* in *Apprendi* and subsequent cases *culminating* with this one [*Booker*]." (emphasis added)); *see also Cunningham*, 2007 WL 135687, at *7 ("[T]he *Jones* opinion presaged our decision, some 15 months later, in *Apprendi v. New Jersey*." (citation omitted)).

51

This technicality can be significant, however, because *McMillan* provided caveats to its general Fifth Amendment rule—caveats which the *Apprendi* line does not create in the Sixth Amendment context. *See Cunningham*, 2007 WL 135687, at \*11, 12, 21, 22 (referring to *Apprendi*'s "bright-line rule"); *Blakely*, 542 U.S. at 308 (contrasting *Apprendi*'s "bright-line rule" with *McMillan*). And this is where the majority and I part company in this case, as the rule it announces does not allow for exception. *See* Maj. Op., *supra*, at 11 ("It is to these facts ['elements' of the 'crime'], *and these facts alone*, that the right[] to . . . proof beyond a reasonable doubt attach[es]." (emphasis added)). I echo Judge Sloviter on this point: "Can the majority really be suggesting that the Due Process Clause . . . is never applicable to any sentencing issue?" Dis. Op., *infra*, at 84 (Sloviter, J., dissenting). If that is its intention, the majority is simply incorrect. Even more disturbing, the majority needlessly calls into question one of the few cases ever to apply *McMillan* and require a heightened burden of proof for sentencing factors. *See* Maj. Op., *supra*, at 24–25 n.8 (citing *United States v. Kikumura*, 918 F.2d 1084, 1100 (3d Cir. 1990) (holding that Guidelines facts having a disproportionate effect on the sentence must be proven by clear and convincing evidence)).

In *McMillan* the Supreme Court spent considerable time detailing exactly what about the Pennsylvania statute at issue there led to the conclusion that it did not violate due process. In effect, the discussion sets out various conditions that, if found to be otherwise, can lead to the conclusion that a sentencing factor must be proven to a higher evidentiary standard despite the general rule. First, the Pennsylvania statute in *McMillan* did not "discard[] the presumption of innocence" or "create . . .

52

[evidentiary] presumptions" that "relieve the prosecution of its burden of proving guilt." *McMillan*, 477 U.S. at 87. Second, the statute did not "alter[] the maximum penalty for the crime committed []or create[] a separate offense calling for a separate penalty." *Id.* at 87–88. Third, the statute and its structural context in Pennsylvania law did not appear to be an attempt by the State to "'evade' the commands of *Winship*" that elements of a crime be proven beyond a reasonable doubt. *Id.* at 89. As an indication of this, the Court noted that the sentencing factor at issue—visible possession of a firearm—had not "historically been treated 'in the Anglo-American legal tradition' as requiring proof beyond a reasonable doubt." *Id.* at 90 (quoting *Patterson v. New York*, 432 U.S. 197, 226 (1977) (Powell, J., dissenting)).

Lower courts eventually distilled these considerations into a single, metaphorical standard used in *McMillan* itself—"a tail which wags the dog." 477 U.S. at 88 ("The [Pennsylvania] statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense."). What this elusive standard means in practice is discussed shortly, but for present purposes what is important is that, just as much as its general holding, *McMillan*'s canine metaphor is still the Fifth Amendment's mandate when it comes to the burden of proof for sentencing factors. *See Blakely*, 542 U.S. at 307–08 (refusing to adopt *McMillan*'s Fifth Amendment standard for the Sixth Amendment, necessarily implying that it still governs Fifth Amendment burden-of-proof questions); *Apprendi*, 530 U.S. at 487 n.13 (discussed above); *Harris*, 536 U.S. at 550, 568 (discussed above).

53

Four years after *McMillan*, our Court was the first to apply the tail-that-wags-the-dog standard to require a heightened burden of proof for Guidelines facts. In *United States v. Kikumura* we held that "if the magnitude of the contemplated departure [from the Guidelines range] is sufficiently great that the sentencing hearing can fairly be characterized as a 'tail which wags the dog of the substantive offense[,]' . . . the factfinding underlying that departure must be established at least by clear and convincing evidence." 918 F.2d at 1100.[25] In the ensuing years, we often relied on *Kikumura* when determining

---

[25]We did not rule that the appropriate standard was any higher (*i.e.*, beyond a reasonable doubt) only because the defendant had not argued for it. *See Kikumura*, 918 F.2d at 1101.

54

the appropriate standard of proof for Guidelines facts,[26] as did courts across the country.[27]

---

[26]*See, e.g.*, *United States v. Mack*, 229 F.3d 226, 232–35 (3d Cir. 2000) (holding that an increase of 39% in Guidelines range and 12% in actual sentence did not require the relevant sentencing factors to be found by clear and convincing evidence); *United States v. Paster*, 173 F.3d 206, 216–17 (3d Cir. 1999) (noting that the Government conceded that a clear-and-convincing standard was proper for the nine-level departure it sought); *United States v. Baird*, 109 F.3d 856, 865 n.8 (3d Cir. 1997) (holding that a five-level departure did not "present the rare circumstance" presented in *Kikumura*); *United States v. Bertoli*, 40 F.3d 1384, 1409–10 (3d Cir. 1994) (applying *Kikumura* to a factual finding which dictated a 50-fold upward departure from the criminal fine as calculated in accordance with the Guidelines); *United States v. Seale*, 20 F.3d 1279, 1287–89 (3d Cir. 1994) (requiring proof by clear and convincing evidence when the enhancement resulted in a seven-fold increase in the Guidelines-calculated fine); *United States v. Mobley*, 956 F.2d 450, 454–59 (3d Cir. 1992) (holding that an enhancement raising the Guidelines range from 15–21 months to 21–27 months did not violate due process).

[27]*See, e.g.*, *United States v. Mezas de Jesus*, 217 F.3d 638, 642–45 (9th Cir. 2000) (citing *United States v. Restrepo*, 946 F.2d 654, 659–60 (9th Cir. 1991) (adopting *Kikumura*), and requiring an uncharged kidnapping to be found by clear and convincing evidence when such a finding would result in a nine-level Guidelines enhancement and the resulting sentencing range

to increase from 31–27 months to 57–71 months); *United States v. Gigante*, 94 F.3d 53, 56 (2d Cir. 1996) ("In our view, the preponderance standard is no more than a *threshold* basis for adjustments and departures, and the weight of the evidence, at some point along a continuum of sentence severity, should be considered with regard to both upward adjustments and upward departures." (emphasis in original)); *United States v. Lombard*, 72 F.3d 170, 183–87 (1st Cir. 1995) (holding it to be a violation of due process not to consider a downward departure where defendant had been acquitted of a state-law murder charge, but the Guidelines required an enhancement based on finding by a preponderance of the evidence that the defendant indeed had committed the murder, causing the Guidelines sentence to go from 262–327 months to mandatory life imprisonment); *United States v. Mergerson*, 4 F.3d 337, 344 (5th Cir. 1993) ("We believe that, although there may be certain cases where a sentencing fact is a 'tail that wags the dog of the substantive offense,' and might arguably require a finding beyond a reasonable doubt, this is not such a case." (citations omitted)); *United States v. Lam*, 966 F.2d 682, 688 (D.C. Cir. 1992) (reserving the question of whether the clear-and-convincing standard might be necessary in "extraordinary circumstances"); *United States v. Trujillo*, 959 F.2d 1377, 1382 (7th Cir. 1992) (holding that the facts supporting a six-level increase in the base offense level did not require a heightened standard of proof, but noting the Seventh Circuit's prior approval of *Kikumura* in *United States v. Schuster*, 948 F.2d 313, 315 (7th Cir. 1991)); *United States v. Townley*, 929 F.2d 365, 369–70 (8th Cir. 1991) (refusing to "foreclose the possibility that in an exceptional case,

Consequently, when the majority here says "there is every reason to believe that the Supreme Court intended that the practices that have guided us and other courts in the twenty years since the Guidelines were first promulgated would continue to govern sentencing in the federal courts," Maj. Op., *supra*, at 9, but then goes on to "question[]" an important part of our due process sentencing jurisprudence from those same twenty years, Maj. Op., *supra*, at 24–25 n.8, there is a disconnect. *Kikumura*, like *McMillan* on which it is based, still controls burden-of-proof questions for Guidelines facts. *See United States v. Archuleta*, 412 F.3d 1003, 1007–08 (8th Cir. 2005) ("Nothing in *Booker* changes the interpretation of *McMillan* in our post-*Apprendi* cases."). There is, therefore, no need to doubt the "statutory and constitutional underpinnings of [*Kikumura*]," Maj. Op., *supra*, at 24–25 n.8, and I do not.[28]

---

such as this one, the clear and convincing evidence standard adopted by [*Kikumura*] might apply."); *United States v. St. Julian*, 922 F.2d 563, 569 n.1 (10th Cir. 1990) (adopting the holding of *Kikumura*).

[28]The Ninth Circuit Court of Appeals has ruled that its own *Kikumura* jurisprudence survives *Booker*. *See United States v. Staten*, 466 F.3d 708, 717–20 (9th Cir. 2006). There, even the Government initially agreed that a heightened burden of proof applied for sentencing factors having a disproportionate effect on the sentence, though it later recanted. *See id.* at 717–18 & n.6.

In contrast, the Seventh Circuit Court of Appeals, relying

It should be of no moment that the "usual in a *Kikumura* case" is for the sentencing court to rule "that the tail ha[s] not wagged the dog." *Reuter*, 463 F.3d at 793. The few defendants who have benefitted from the minimal due process protection that *Kikumura* (as subsequently interpreted) provides surely are grateful that courts have not yet abandoned entirely the Fifth Amendment at sentencing. I would not have us do so now.

B.

To repeat, I am sympathetic to the position advanced by Judge Sloviter and Judge McKee, who would require sentencing enhancements that themselves constitute separate crimes be proven beyond a reasonable doubt. The majority claims that this position is "novel." Maj. Op., *supra*, at 20. And though I ultimately cannot join my dissenting colleagues, the principle behind their position reflects a concern that is anything but novel.

Contrary to the majority's assertion that the separate-offense concept "appears nowhere in Supreme Court jurisprudence," Maj. Op., *supra*, at 23, that Court in fact

---

on the vacated panel decision in this case, has held that *Kikumura*-style due process analysis did not survive *Booker*. *See United States v. Reuter*, 463 F.3d 792, 793 (7th Cir. 2006). However, that decision has little persuasive value because, though the *en banc* majority here needlessly calls *Kikumura* into doubt, it ultimately does not endorse the initial panel's gratuitous "overruling" of *Kikumura*. *See* Maj. Op., *supra*, at 24–25 n.8.

repeatedly has expressed concern over Government manipulation of the criminal justice system by circumventing the procedural protections of trial in order to achieve an identical result at sentencing. *See, e.g.*, *Blakely*, 542 U.S. at 307 n.11 ("Another example of conversion from separate crime to sentence enhancement . . . is the obstruction-of-justice enhancement. Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt[,] . . . is unclear." (internal citations omitted)).[29] Recall also that one of the several considerations

---

[29]When the Supreme Court in *Blakely* sought to develop the test for when the Sixth Amendment required that a jury find a particular fact, it considered several options. The first of these was that "the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors—no matter how much they may increase the punishment—may be found by the judge." *Blakely*, 542 U.S. at 306. The Court rejected this approach, however, saying that it "would mean, for example, that a judge could sentence a man for committing murder even if the jury convicted him only of illegally possessing the firearm used to commit it—or of making an illegal lane change while fleeing the death scene. Not even *Apprendi*'s critics would advocate this absurd result." *Id.*

Not only does this discussion prove that my dissenting colleagues' concern is not novel, one would also think the majority here might pause in the face of it. The same test labeled "absurd" by the Supreme Court for the Sixth Amendment is the one adopted by the majority for the Fifth

*McMillan* identified as significant to its due process analysis was that the sentencing factor at issue there was *not* a fact that had "historically been treated in the Anglo-American tradition as requiring proof beyond a reasonable doubt." 477 U.S. at 90 (internal quotation marks omitted). In other words, unlike the enhancement at issue in this case, the sentencing factor in *McMillan* did not itself constitute a crime. Far from "novel," therefore, the relevance of a sentencing factor also being a separate crime in determining the applicable burden of proof certainly exists in Supreme Court precedent.

For two reasons, however, I cannot join Judge Sloviter or Judge McKee in dissent. First, the rule propounded by the dissenting opinions—like the majority opinion—is inconsistent with *McMillan*, which I believe is controlling here. *See supra* Part II.A & n.11. Second, that rule is incompatible with the Supreme Court's ruling in *United States v. Watts*, 519 U.S. 148 (1997), which also remains good law despite unrelenting challenge. I will address each of these reasons in turn.

Precedent from this and other courts that have applied *McMillan* demonstrates that there are several relevant considerations in deciding what due process requires in the sentencing context, not simply whether a particular enhancement is also a separate crime. As already noted, the Supreme Court in *McMillan* cited no fewer than three considerations that were significant to its holding that a heightened standard was not required in that case, only one of which was the sentencing

Amendment (though I concede it does not produce an "absurd" result in this instance).

60

factor's traditional treatment in criminal law.  *See McMillan*, 477 U.S. at 87–90.

In *United States v. Mobley*, 956 F.2d 450, 454–59 (3d Cir. 1992), we addressed an argument similar to the one raised here, namely that U.S.S.G. § 2K2.1(b)(2) (now § 2K2.1(b)(4)) constituted a separate crime and, without proof of *scienter*, violated the Due Process Clause.  We rejected this argument, noting the constitutional differences between trial and sentencing.  We stated that the similarity between a sentencing enhancement and a separate statutory offense "says nothing about whether [a defendant's right to] due process was violated.  All it means is that under certain circumstances Congress and the [Sentencing] Commission have set the same penalties.  This is not the situation of a tail wagging the dog; but rather, of two dogs having tails of equal length." *Id.* at 457.  As we explained, there is a "distinction among a sentence, sentence enhancement, and definition of an offense." *Id.*  Consequently, we held that even though a sentencing enhancement might also be a separate crime, that fact does not categorically preclude its use at sentencing, either absent a finding of *scienter* or, most relevant here, on a lower standard of proof.[30]

In *United States v. Lombard*, 72 F.3d 170 (1st Cir. 1995), for example, the First Circuit Court of Appeals produced a

[30]Judge Sloviter avoids *Mobley* only by noting that it is a panel decision not binding on this *en banc* Court.  *See* Dis. Op., *infra*, at 82–83 (Sloviter, J., dissenting).  That does not make the case incorrect, however.  I believe that *Mobley* is "good law"—if only because of binding Supreme Court precedent.

model due process analysis under *McMillan*. There, the defendant had been acquitted of two state-law murder charges but then was prosecuted on a federal firearms offense. On conviction of the federal charge, the Government successfully enhanced the defendant's sentence based on proof by a preponderance of the evidence that in fact he *had* committed the state-law murders with the firearm that was the subject of his federal conviction. The District Court sentenced the defendant to life in prison pursuant to the then-mandatory Guidelines.

The First Circuit reversed. *Id.* 172–74. Significantly, the court cited no *single* reason. As an initial matter, the base offense level in *Lombard* had been calculated, in accordance with the Guidelines, "*as if* [the defendant's] offense of conviction had been murder." *Id.* at 177. This, combined with no statutory maximum for the underlying offense, took the Guidelines range from 262–327 months in prison to mandatory life imprisonment—which the court characterized as "punishment on an entirely different order of severity." *Id.* at 178. Moreover, not only did the enhancing conduct also constitute separate crimes, the defendant had already been acquitted of them. "Without impugning the principle that acquitted conduct may be considered in determining a defendant's sentence," the procedural history in *Lombard* made clear that the Government had intended from the beginning to use a conviction on the federal firearms charge to accomplish what the state-law murder charges had not. *Id.* at 178–80. The First Circuit then concluded,

> Given the magnitude of the sentence "enhancement," the seriousness of the "enhancing" conduct in relation to the offense of

conviction, and the seemingly mandatory imposition of the life sentence, this summary process effectively overshadowed the firearms possession charge and raises serious questions as to the proper allocation of the procedural protections attendant to trial versus sentencing. We would be hard put to think of a better example of a case in which a sentence "enhancement" might be described as a "tail which wags the dog" of the defendant's offense of conviction.

*Id.* at 180 (citations omitted).

*Mobley*'s and *Lombard*'s applications of *McMillan* demonstrate that the focus of a proper *McMillan* analysis is not only whether an enhancing fact constitutes a separate crime, but, more broadly, whether that fact "constitute[s] *the primary conduct for which* [*the defendant*] *is being punished*." *Mobley*, 956 F.2d at 459 (emphasis added); *see also Lombard*, 72 F.3d at 178 (describing the enhancing facts—the murders—as having been "treated as the gravamen of the offense"). My dissenting colleagues' suggested due process standard (focusing only on the "separate crime" concept) is, therefore, both too broad and too narrow: it would require a heightened burden of proof in more cases than Supreme Court precedent currently supports (*i.e.*, all "separate crime" enhancements), but at the same time would fail to require it in certain deserving cases (*i.e.*, where

"the tail wags the dog," in that the effect of the enhancement is too severe).[31]

---

[31]Judge McKee reconciles *McMillan* with *Apprendi*—and thereby escapes its import in this case—with a "conduct" versus "crime" dichotomy he perceives in Supreme Court precedent. He argues that the difference between *McMillan* on the one hand, and *Apprendi* on the other, is that the former approved of a traditional, conduct-related sentencing factor whereas the latter disapproved of a sentencing factor that was also a separate crime. *See* Dis. Op., *infra*, at Part I.B (McKee, J., dissenting). I respectfully disagree with this assessment. Just as in *McMillan*, neither in *Apprendi* nor any of the Supreme Court cases that followed it could a defendant have been sent to jail solely upon a finding (by a jury or otherwise) of the sentencing factor at issue. *See Apprendi*, 530 U.S. at 468–69 ("purposeful intimidation"); *see also Cunningham*, 2007 WL 135687, at *5 ("vulnerable victim" and "serious danger to community"); *Booker*, 543 U.S. at 227 (drug quantity); *Blakely*, 542 U.S. at 300 ("deliberate cruelty"); *Ring*, 536 U.S. at 592–93 ("aggravating circumstances" for death penalty eligibility). Not only did the sentencing schemes invalidated in those cases rely on factors that were not separate crimes, those factors were also of the traditional, conduct-related type that Judge McKee approves. Rather, the dispositive distinction between the *Apprendi* cases and *McMillan* is that the former dealt with sentencing factors that push sentences over statutory maximums, whereas the latter dealt with sentencing factors that only operated below those maximums. Because the sentencing factor at issue here is of this second variety, *McMillan* controls this

Further increasing my discomfort with joining my colleagues in dissent is the Supreme Court's holding in *United States v. Watts*. There, the Court reversed a panel of the Ninth Circuit Court of Appeals that had held it a violation of the Double Jeopardy Clause of the Fifth Amendment for sentencing courts to factor into a defendant's sentence the conduct for which he had been acquitted. *See Watts*, 519 U.S. at 149. The Court relied partly on the differing burdens of proof during trial and sentencing to reject the Ninth Circuit's contention that the acquittal had some preclusive effect, restating its holding in *McMillan* that "application of the preponderance standard at sentencing generally satisfies due process." *Id.* at 155–56. Continuing the discussion, the Court said:

> [A]n acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof. The Guidelines state that it is appropriate that facts relevant to sentencing be proved by a preponderance of the evidence, and we have held that application of the preponderance standard at sentencing generally satisfies due process. We acknowledge a divergence of opinion among the Circuits as to whether, in extreme circumstances, relevant conduct that would dramatically increase the sentence must be based on clear and convincing evidence. The cases before us today do not

case. *See supra* Part II.A & n.11.

65

> present such exceptional circumstances, and we therefore do not address that issue. We therefore hold that a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence.

*Id.* at 156–57 (footnote, citations, and internal quotation marks omitted) (citing, among other cases, *Lombard*, 72 F.3d at 186–87, and *Kikumura*, 918 F.2d at 1102). Though *Watts* does not address directly the due process question before us, this passage amply demonstrates its relevance. The issue in *Watts* involved the sentencing treatment of a separate offense, and I find it instructive that the Court did not express any special concern about that fact during the course of its *McMillan* and *Kikumura* discussion.

Since the Supreme Court decided *Booker*, several district courts have called into question the continuing viability of *Watts*.[32] However, every court of appeals to have spoken on the

---

[32]*See, e.g.*, *United States v. Ibanga*, 454 F. Supp. 2d 532, 536–38 (E.D. Va. 2006); *United States v. Coleman*, 370 F. Supp. 2d 661, 668–73 (S.D. Ohio 2005); *United States v. Pimental*, 367 F. Supp. 2d 143, 149–53 (D. Mass. 2005); *United States v. Gray*, 362 F. Supp. 2d 714, 721–22 (S.D. W. Va. 2005); *United States v. Carvajal*, No. 04 CR 222AKH, 2005 WL 476125, at *5 (S.D.N.Y. Feb. 22, 2005).

question so far has held that *Watts* remains good law.[33] Justice Stevens's merits opinion in *Booker* characterized *Watts* as having "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause," *Booker*, 543 U.S. at 240 n.4, and was able to avoid dealing with its holding. But as Judge McKee's meticulous parsing of that case indicates, *see* Dis. Op., *infra*, Part II (McKee, J., dissenting), doing the same here is considerably harder.[34]

---

[33]*See United States v. Mercado*, No. 05-50624, ___ F.3d ___, 2007 WL 136702 (9th Cir. Jan. 22, 2007); *United States v. Gobbi*, 471 F.3d 302, 313–14 (1st Cir. 2006); *United States v. Dorcely*, 454 F.3d 366, 371–73 (D.C. Cir. 2006); *United States v. High Elk*, 442 F.3d 622, 626 (8th Cir. 2006); *United States v. Vaughn*, 430 F.3d 518, 525–27 (2d Cir. 2005); *United States v. Price*, 418 F.3d 771, 787–88 (7th Cir. 2005); *United States v. Magallanez*, 408 F.3d 672, 684–85 (10th Cir. 2005); *United States v. Duncan*, 400 F.3d 1297, 1304–05 (11th Cir. 2005).

[34]The very mention in *Booker* of *Watts*'s narrow holding would seem to indicate that it is still binding on lower courts. *See Booker*, 543 U.S. at 240 n.4. But even if the specific holding of *Watts* survives the Supreme Court's *Apprendi* jurisprudence, the practice of considering acquitted conduct might not. That is, even if considering acquitted conduct for sentencing purposes does not violate the Double Jeopardy or Due Process Clause of the Fifth Amendment, doing so might still violate the jury right of the Sixth Amendment as expounded by *Apprendi* and its progeny. Our Court has not yet spoken on this issue, but because Grier only presses Fifth Amendment

67

Therefore, in light of *Watts* and my prior discussion of *McMillan*, I reluctantly cannot accept my dissenting colleagues' position as consistent with controlling Supreme Court precedent. According to that precedent, due process requires only that sentencing factors (as denominated by Congress), including those that also constitute separate crimes, be proven at sentencing by a preponderance of the evidence unless they become the "tail which wags the dog of the substantive offense."

\* \* \* \* \*

In this case, nobody—not even Grier himself—contends that the "tail" of aggravated assault has wagged the "dog" of firearms possession.[35] The District Court calculated the initial recommended Guidelines range at 84–105 months in prison. Though application of the aggravated-assault enhancement raised the applicable base offense level by four points, the

---

arguments, I leave it for another day.

[35]I assume here that the facts are as found by the District Court. However, I support the majority's remand for a fuller exploration and explanation of these findings and of Grier's ultimate sentence, *see* Maj. Op., *supra*, Parts II.B & II.C, particularly in light of the concerns raised by Judge Sloviter's dissent, *see* Dis. Op., *infra*, Part III. In joining Parts II.B. and II.C of the majority opinion, I do not understand it to be an "affirmation of the District Court's finding that Grier committed an aggravated assault," as Judge Sloviter believes. Dis. Op., *infra*, at 107 (Sloviter, J., dissenting).

District Court granted a departure of two levels because it determined that Grier was not wholly responsible for the circumstances that led to the assault (and thus the enhancement). This left an advisory range of 100–120 months, after which the District Court imposed a sentence of 100 months, which was within the initial, unenhanced advisory Guidelines range. The obvious conclusion is that Grier was not punished *primarily* for aggravated assault. *See Mobley*, 956 F.2d at 459. Finding by a preponderance of the evidence that Grier committed aggravated assault did not result in a due process violation.

Though someday, as I argue it should, the Constitution may be interpreted to require that all facts the law deems worthy of additional punishment be found by a jury beyond a reasonable doubt (or, at the least, that a judge do so by that same standard), binding Supreme Court precedent precludes advancing such a position now. *See supra* Part I. To do so would chase the shadow of *Apprendi* and *Blakely* while ignoring *McMillan*, which requires only that sentencing factors be proven by a preponderance of the evidence in most cases. Disturbingly, this is so even if those facts also constitute separate crimes, as here.

In basing my decision on *McMillan* and its "tail that wags the dog" metaphor, I have not ignored the criticism it has received as a rule of law—even from the Supreme Court that established it. *See, e.g.*, *Blakely*, 542 U.S. at 307, 308 (noting that "[t]he subjectivity of the standard is obvious" and describing it as "manipulable"). The difficulties in applying it, as Judge McKee cogently demonstrates, are undeniable. *See* Dis. Op., *infra*, Part III (McKee, J., dissenting). Its primary virtue, however, is that it properly frames the inquiry: "For what conduct is the defendant *actually* being sentenced?"

Moreover—and more importantly—*McMillan*'s rule is still binding on the lower courts.

It may be that the Justices will one day reconsider *McMillan* and apply *Apprendi*'s bright-line rule to Fifth Amendment questions, just as the majority here has done. Our job, though, is not to place bets on the direction of constitutional doctrine and gamble with defendants' constitutional rights. Even if it were, the majority cites nothing to indicate that the Supreme Court would adopt its position, which only diminishes a defendant's constitutional protections. Indeed, a faithful reading of the entire *Apprendi* line of cases—including *Blakely*, *Booker*, and *Cunningham*—leads to the opposite conclusion. *See Booker*, 543 U.S. at 236–37 (noting that modern sentencing practices have "forced the Court to address the question how the right of jury trial could be preserved, in a meaningful way guaranteeing that the jury would still stand between the individual and the power of the government"); *see also Cunningham*, 2007 WL 135687, at *14 ("*Booker*'s remedy for the Federal Guidelines . . . is not a recipe for rendering our Sixth Amendment case law toothless."). In this respect, Judge Sloviter and Judge McKee eventually may be proven correct. I hope that day comes, but it is not yet this one.

Before concluding, I pause to stress that the majority holds only that the reasonable-doubt standard is not *required* by the Fifth Amendment when finding Guidelines facts. The Court's ruling applies only to the calculation of the advisory Guidelines range at step one of the sentencing process that we set out in *United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006). Significantly, nothing about the majority's ruling *prevents* a sentencing court from taking into account the strength

70

of the evidence (or lack thereof) supporting a Guidelines enhancement when it considers the § 3553(a) factors at *Gunter*'s step three—especially an enhancement that also constitutes a separate crime.[36] If it were otherwise, our holding today would not be tenable; for then the Guidelines would not be truly advisory, and *Apprendi*, *Blakely*, and Justice Stevens's merits opinion in *Booker* would come into full force. We must be ever careful in our reasonableness review, therefore, not to restrict a sentencing court's discretion solely on the basis of the

---

[36]*See* 18 U.S.C. § 3553(a); *Gunter*, 462 F.3d at 247–49; *see also Reuter*, 463 F.3d at 793 ("A judge might reasonably conclude that a sentence based almost entirely on evidence that satisfied only the normal civil standard of proof would be unlikely to promote respect for the law or provide just punishment for the offense of conviction. That would be a judgment for the sentencing judge to make and we would uphold it so long as it was reasonable in the circumstances."); *United States v. Dazey*, 403 F.3d 1147, 1177 (10th Cir. 2005) ("District courts might reasonably take into consideration the strength of the evidence in support of sentencing enhancements, rather than (as in the pre-*Booker* world) looking solely to whether there was a preponderance of the evidence, and applying Guidelines-specified enhancements accordingly."); *cf. United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) ("[D]istrict courts should consider the jury's acquittal [on another charge] when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence.").

71

Guidelines, lest we recreate an unconstitutional sentencing scheme.[37]

On February 20, 2007, the Supreme Court will hear two cases addressing the Guidelines' proper role in post-*Booker* criminal sentencing. *See United States v. Rita*, 177 Fed. Appx. 357, 2006 WL 1144508 (4th Cir. 2006), *cert. granted*, 75 U.S.L.W. 3243 (U.S. Nov. 3, 2006) (No. 06-5754) (addressing a presumption of reasonableness for within-Guidelines sentences); *United States v. Claiborne*, 439 F.3d 479 (8th Cir.

---

[37]One significant danger in this regard comes from presuming the reasonableness of a sentence within the Guidelines range. *See* Stephen R. Sady, *Guidelines Appeals: The Presumption of Reasonableness and Reasonable Doubt*, 18 FED. SENT. R. 170 (2006). Nevertheless, seven courts of appeals have chosen to walk the constitutional line and formally accept such a presumption. *See United States v. Dorcely*, 454 F.3d 366 (D.C. Cir. 2006); *United States v. Green*, 436 F.3d 449 (4th Cir. 2006); *United States v. Alonzo*, 435 F.3d 551 (5th Cir. 2006); *United States v. Williams*, 436 F.3d 706 (6th Cir. 2006); *United States v. Mykytiuk*, 415 F.3d 606 (7th Cir. 2005); *United States v. Lincoln*, 413 F.3d 716 (8th Cir. 2005); *United States v. Kristl*, 437 F.3d 1050 (10th Cir. 2006). Our Court, along with three others, has prudently not adopted this constitutionally doubtful rule. *See United States v. Cooper*, 437 F.3d 324 (3d Cir. 2006); *see also United States v. Jiménez-Beltre*, 440 F.3d 514 (1st Cir. 2006) (*en banc*); *United States v. Fernandez*, 443 F.3d 19 (2d Cir. 2006); *United States v. Talley*, 431 F.3d 784 (11th Cir. 2005).

2006), *cert. granted*, 75 U.S.L.W. 3243 (U.S. Nov. 3, 2006) (No. 06-5618) (addressing the required justification for substantial Guidelines variances). I can only hope that with these cases and others—in addition to harmonizing the "discordant symphony"[38] that has developed in the lower courts on post-*Booker* sentencing issues—the Supreme Court will continue the reexamination of criminal sentencing it only recently began. The principles that begat *Apprendi* and *Blakely* are worthy of continued adherence. It is only "a matter of simple justice." *Apprendi*, 530 U.S. at 476.

SLOVITER, *Circuit Judge*, dissenting, with whom Judge McKee joins.

It is ironic that a Supreme Court decision that upheld two lower court decisions holding that sentences that were based on additional facts found by the sentencing judge by a preponderance of the evidence violated the defendants' Sixth Amendment rights, United States v. Booker, 543 U.S. 220, 226 (2005), a decision that bolstered an important constitutional right, should be viewed by the majority to authorize enhancement of a defendant's sentence based on the sentencing judge's finding by a preponderance of evidence that the defendant committed a separate offense for which he was never

---

[38]*See Booker*, 543 U.S. at 312 (Scalia, J., dissenting in part) ("What I anticipate will happen is that 'unreasonableness' review will produce a discordant symphony of different standards, varying from court to court and judge to judge . . . .").

73

tried or convicted, a decision that erodes a well-established constitutional right. It is even more ironic that the majority does so in the face of the Supreme Court's most recent opinion in Cunningham v. California, No. 05-6551, 2007 WL 135687 (Jan. 22, 2007), where the Court reaffirmed its holdings in a series of cases that under the Sixth Amendment it is not the trial judge but the jury that must make the relevant finding of fact upon which a sentencing enhancement is based, and that the jury must make that finding beyond a reasonable doubt.

The majority affirms the District Court's sentence based on its finding by a preponderance of the evidence that Grier committed aggravated assault under Pennsylvania law even though Grier pled guilty only to possession of a firearm by a convicted felon and consistently denied that he committed an aggravated assault. That this court should adopt that view of Booker even though the Booker constitutional opinion (authored by Justice Stevens) was directed to the protection of a defendant's Sixth Amendment right to a jury determination is simply astonishing.[39] The majority's cramped view of the Sixth Amendment has now been rejected by Cunningham, a case the majority marginalizes in a footnote.

I cannot accept the majority's abnegation of the Fifth Amendment's imperative that a criminal defendant is entitled to

---

[39]The majority does not deign to respond to Judge Ambro's devastating attack on its reasoning in his concurring opinion. I believe that my references to Cunningham in my response to the majority apply equally to the concurring opinion's reference to that case.

74

the determination of his or her guilt beyond a reasonable doubt. The majority so holds based on its expansive interpretation of language in the Booker opinion dealing with the remedy for the Sixth Amendment issue (authored by Justice Breyer). Neither of the Supreme Court's Booker decisions discussed the Fifth Amendment nor did they suggest that it had no role in sentencing. Yet the majority's decision abrogates one of the most important, if not the most important, of the rights that the Constitution affords criminal defendants: the right to be found guilty only by a finding beyond a reasonable doubt.

I.

The history and rationale of a criminal defendant's right to a determination that s/he be convicted only after a jury determination that the defendant is guilty of the crime charged beyond a reasonable doubt needs no extended discussion. As the Supreme Court has stated, a Fifth Amendment challenge, like a Fourteenth Amendment challenge, involves a constitutional protection of "surpassing importance: the proscription of any deprivation of liberty without 'due process of law.'" United States v. Apprendi, 530 U.S. 466, 476 (2000). Although the Constitution does not explicitly require that a finding of guilt be made under a beyond-a-reasonable-doubt standard, the Supreme Court made that explicit when it held: "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970).

The rationale for requiring that rigorous standard of proof was discussed by Justice John Marshall Harlan II with his

75

incomparable analytic reasoning in his concurring opinion in In re Winship where he expounded on the difference between the preponderance-of-the-evidence standard of proof and the beyond-a-reasonable-doubt standard. He explained that "even though the labels used for alternative standards of proof are vague and not a very sure guide to decisionmaking, the choice of the standard for a particular variety of adjudication does . . . reflect a very fundamental assessment of the comparative social costs of erroneous factual determinations." Id. at 369-70. He further explained that "a standard of proof represents an attempt to instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." Id. at 370. He continued that although the two phrases "are quantitatively imprecise, they do communicate to the finder of fact different notions concerning the degree of confidence he is expected to have in the correctness of his factual conclusions." Id.

Justice Harlan concluded that whereas a preponderance-of-the-evidence standard seems particularly appropriate in civil cases between two parties for money damages where the factfinder need determine that the existence of a fact is more probable than its nonexistence, the criminal case stands on a different footing. Recognizing that there is always a margin of error in factfinding, he quoted from an earlier opinion in which Justice Brennan stated that "'[w]here one party has at stake an interest of transcending value – as a criminal defendant his liberty – this margin of error is reduced as to him by the process of placing on the other party the burden . . . of persuading the factfinder at the conclusion of the trial of his guilt beyond a

76

reasonable doubt.'" Id. at 372 (quoting Speiser v. Randall, 357 U.S. 513, 525-26 (1958)).

The entitlement to proof beyond a reasonable doubt is "as equally well-founded" as the right to a jury determination and is based in the common law. See Apprendi, 530 U.S. at 478 (noting that the "demand for a higher degree of persuasion in criminal cases was recurrently expressed from ancient times . . . . and is now accepted in the common law jurisdictions as the measure of persuasion by which the prosecution must convince the trier of all essential elements of guilt") (quotation marks and citation omitted). And the right to jury trial "has been enshrined since the Magna Carta." Booker, 543 U.S. at 239.

The question whether the Fifth Amendment right to due process requires that the fact that formed the basis for Grier's four-level sentencing enhancement, i.e., that he committed a separate felony while possessing the firearm, be found beyond a reasonable doubt, is a question of law and is therefore subject to plenary review.[40] See United States v. Williams, 235 F.3d 858, 861 (3d Cir. 2000).

Reiterating established principles of constitutional law, the Court in Booker, quoting Blakely v. Washington, 542 U.S. 296, 301 (2004), stated that it is "the defendant's right to have

---

[40] Grier also alleges that we may review his sentence because it is "unreasonable." A sentence imposed in violation of Grier's Fifth Amendment rights would be imposed in violation of the law and, therefore, unreasonable. United States v. Cooper, 437 F.3d 324, 327–28 (3d Cir. 2006).

the jury find the existence of 'any particular fact' that the law makes essential to his punishment," Booker, at 543 U.S. at 232, and "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact – no matter how the State labels it – must be found by a jury beyond a reasonable doubt." Id. at 231, quoting Ring v. Arizona, 536 U.S. 584, 602 (2002). If there had been any doubt of the applicability of the beyond-a-reasonable-doubt standard to sentencing enhancements, it should have been put to rest by the language of the Cunningham Court when it said, "This Court has repeatedly held that, under the Sixth Amendment, any fact that exposes a defendant to a greater potential sentence must be found by a jury, not a judge, and established beyond a reasonable doubt, not merely by a preponderance of the evidence." Cunningham, 2007 WL 135687, at *7 (emphasis added).

Disregarding the uninterrupted line of decisions that underlay those two principles, the majority approves the conclusion of the District Court that the burden of proof to be applied to its determination that Grier committed an aggravated assault was preponderance of the evidence. Maj. op. at 25. The majority states that "[t]his standard is suggested by the Guidelines [citing not the Guidelines but a commentary in the U.S. Sentencing Guidelines Manual that does not support the proposition], is not precluded by the Fifth or Sixth Amendments, *see Booker*, 543 U.S. at 259 ('the remainder of the act functions independently'), and has been approved by this Court, *see, e.g., United States v. Mobley*, 956 F.2d 450, 455 (3d Cir. 1992)." Maj. op. at 24. The majority errs on all three points. If these purported supporting authorities do not support the majority's

78

adoption of the preponderance-of-the-evidence standard, the majority's decision is without any support or precedent, the conclusion to which I am drawn.

The majority's statement that its adoption of the preponderance-of-the-evidence standard "is suggested by the Guidelines," its first purported authority, is just flat out wrong. There is no Sentencing Guideline that addresses the issue of the standard of proof in a criminal case. Indeed, that would be beyond the authority granted to the Sentencing Commission.

In the Booker constitutional opinion, the Court, asserting that it would be unconstitutional for the Sentencing Commission to define criminal elements, interpreted the Sentencing Reform Act as authorizing the Commission only "to identify the facts relevant to sentencing decisions and to determine the impact of such facts on federal sentences." Booker, 543 U.S. at 241-42. In so holding, the Court referred to the decision in Mistretta, 488 U.S. 361, 377 (1989), where it rejected a challenge to the delegation of that authority. The Booker opinion construed Mistretta as "premised on an understanding that the Commission, rather than performing adjudicatory functions, instead makes political and substantive decisions." Booker, 543 U.S. at 242. The Booker opinion stated that in Mistretta it noted that "the promulgation of the guidelines was much like other activities in the Judicial Branch, such as the creation of the Federal Rules of Evidence, all of which are non-adjudicatory activities." Id. Thus, the delegation to the Commission did not encompass a definition of the elements of a criminal offense and adjudicatory functions. The standard of proof, of course, is an adjudicatory function, not delegated to the Commission. Booker, 543 U.S. at 243 (quoting Mistretta).

79

The quotation included in the majority's opinion which it believes supports its standard of proof is from the Commentary to Guideline § 6A1.3, a Policy Statement dealing with Resolution of Disputed Factors. One would ordinarily assume that if the issue of standard of proof for disputed factors appeared somewhere in the Guidelines, this would be the appropriate place. But there is nothing in the text of that Guideline/Policy Statement that addresses the standard of proof. Nor, if read carefully, does the sentence of the statement in the Commentary quoted by the majority address the issue of the required standard of proof of a criminal offense. Instead it is directed only to the issue of "resolving disputes regarding application of the guidelines to the facts of a case." The entirety of the sentence at issue is repeated in the margin.[41] Because there is no Guideline applicable to the standard of proof of a criminal offense, there is no "dispute regarding application of [any] guideline[]" and the sentence on which the majority relies is inapplicable.

What is of particular interest and relevance is the discussion of this sentence in the separate opinion of Justice Thomas in Booker, where he states,

> The commentary to § 6A1.3 states that the Commission believes that use of a preponderance

---

[41]"The Commission believes that use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case." U.S. Sentencing Guidelines Manual § 6A1.3 cmt. (2006).

of the evidence standard is appropriate . . . . <u>The
Court's holding today corrects this mistaken
belief. The Fifth Amendment requires proof
beyond a reasonable doubt, not by a
preponderance of the evidence, of any fact that
increases the sentence beyond what could have
been lawfully imposed on the basis of facts found
by the jury or admitted by the defendant.</u>

543 U.S. at 319 n.6 (Thomas, J., dissenting in part) (emphasis
added). <u>Cf.</u> <u>United States v. Pimental</u>, 367 F. Supp. 2d 143, 153
(D. Mass. 2005) ("Certain facts . . . . assume inordinate
importance in the sentencing outcome. So long as they do, they
should be tested by our highest standard of proof.").

Justice Thomas is not the only one to have commented
critically on the statement in the Guideline commentary. <u>See,
e.g.</u>, Note, <u>Sentencing After Booker: The Impact of Appellate
Review on Defendants' Rights</u>, 24 Yale L. & Pol'y Rev. 173,
198-99 (2006) ("Although the Supreme Court has countenanced
the preponderance standard at sentencing, the Court has never
required the application of that standard. . . . Moreover, this
Guideline has not been officially re-examined by Congress since
<u>Apprendi</u>, <u>Blakely</u>, and <u>Booker</u> were decided. Thus, one should
not rely on this commentary for the strong proposition that a
heightened standard of proof is impermissible."); <u>see also</u>
Douglas A. Berman, <u>Tweaking Booker: Advisory Guidelines in
the Federal System</u>, 43 Hous. L. Rev. 341, 387 (2006)
("Notably, the Sentencing Reform Act does not speak to the
burden of proof issue at all. And though the commentary to
Guidelines' § 6A1.3 states that the Commission 'believes that
use of a preponderance of the evidence standard is appropriate

. . . ['] in resolving factual disputes, this provision is overdue for reexamination in the wake of the Supreme Court's decisions in Apprendi, Blakely, and Booker.").

I leave Booker, the heart of the majority's decision, for later discussion and turn to the majority's third proffered authority for its adoption of the preponderance-of-the- evidence standard for proof of an offense, i.e., United States v. Mobley, 956 F.2d 450 (3d Cir. 1992). The issue in that case was whether the Government, which sought to enhance defendant's sentence following conviction of possession of a firearm by a convicted felon because the gun was stolen, must show defendant knew the gun was stolen to enhance his sentence. In a two to one decision, with Judge Mansmann dissenting, we held that the then-applicable Guideline, § 2K2.1(b)(2) (authorizing enhancement based on fact that the gun was stolen), did not have a scienter element. The majority rejected Judge Mansmann's position that a sentencing enhancement under the Guidelines may not be substituted for a criminal conviction consistent with due process.

The facts in Mobley are, on their face, distinguishable from Grier's situation because the nexus in Mobley between possession of the weapon and its being a stolen weapon clearly satisfied the relevant Guideline prerequisite that the stolen gun was in connection with the offense of conviction. But I need not rely on that distinction. Mobley was a panel decision. It is our tradition that a panel decision does not bind the court sitting en banc. As we stated in an earlier en banc decision, "Because we are now en banc, neither the language nor the holdings of those panel decisions bind us here." Orson, Inc. v. Miramax Film Corp., 189 F.3d 377, 380 (3d Cir. 1999) (en banc); see also

82

Mariana v. Fisher, 338 F.3d 189, 201 (3d Cir. 2003); Halderman v. Pennhurst State School & Hospital, 673 F.2d 628, 641 n.1 (3d Cir. 1982) ("To be sure, this court, sitting *en banc*, [may] overrule . . . panel decisions.") (en banc) (Garth, J., concurring in part and dissenting in part). It follows that Mobley, one of the majority's three proffered authorities, cannot serve as precedent for the majority's adoption of the preponderance-of-the-evidence standard.

## II.

I turn then to Booker, on which the majority places its principal reliance for its holding that "[o]nce a jury has found a defendant guilty of each element of an offense beyond a reasonable doubt, he has been constitutionally deprived of his liberty and may be sentenced up to the maximum sentence authorized under the United States Code without additional findings beyond a reasonable doubt." Maj. op. at 10. Neither of the Booker opinions ever says or suggests such a proposition, and I believe it is seriously flawed, certainly as applied in this case.

Although Grier pled guilty to possession of a firearm by a convicted felon (the guilty plea equivalent to a jury finding), no jury found him guilty of aggravated assault, a different and independent offense. Grier's guilty plea to one offense (for which he would have been entitled to the beyond-a-reasonable doubt standard) cannot justify diminution of the applicable standard of proof applied by a judge for a separate offense.

I know of no authority that contests that the beyond-a-reasonable doubt standard is as equally applicable to a judge who sits as the trier of fact as to a jury. In In re Winship, the

83

Court held that a provision of the New York Family Court Act that authorized a judge to determine by a preponderance of the evidence that a juvenile was delinquent – that is, guilty of a crime – violated the juvenile's due process rights. In reversing the decision of the New York Court of Appeals that had sustained the constitutionality of the Act, Justice Brennan noted that "the requirement of proof beyond a reasonable doubt has this vital role in our criminal procedure for cogent reasons. The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction." 397 U.S. at 363.

Can the majority really be suggesting that the Due Process Clause, with its requirement of proof beyond a reasonable doubt, is never applicable to any sentencing issue? In Jones v. United States, 526 U.S. 227 (1999), the Court vacated a sentence imposed upon a criminal defendant who was found guilty of violating the federal carjacking statute, 18 U.S.C. § 2119. Section 2119 makes carjacking a crime, and then in three subsections sets forth what the Court held are three distinct offenses with three maximum penalties. See id. at 229. Subsection 1 provides that the penalty for carjacking is a fine or imprisonment of not more than 15 years or both; Subsection 2 provides that if serious bodily injury results, the penalty is a fine or imprisonment of not more than 25 years or both; Subsection 3 provides that if death results, the penalty is a fine or imprisonment for any number of years up to life or both.

Serious bodily injury was not pled in the Jones indictment nor did the district court instruct on that issue. Nonetheless, the district court sentenced Jones to 25 years on the carjacking,

84

finding by a preponderance of the evidence that there was serious bodily injury. The Jones factual scenario does not differ markedly from that presented in this case.

When the Jones case reached the Supreme Court, the Court rejected the Government's argument that the fact of serious bodily harm was merely a sentencing factor and instead construed § 2119 "as establishing three separate offenses by the specification of distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." Id. at 252. The Court found that permitting the judge to make findings regarding serious bodily harm to the victim by a preponderance of the evidence and thereby increasing the sentencing range for that crime would present a serious due process issue. See id. at 243.

The majority states that Jones was a statutory interpretation case, not a statement of constitutional doctrine, and suggests that the holding in Jones has no relevance to the issue before us. That reading of Jones is belied by the rationale for the opinion given by the Supreme Court itself which discussed at length the "'grave and doubtful constitutional questions'" id. at 239 (quoting U.S. ex rel. Attorney Gen. v. Del. & Hudson Co., 213 U.S. 366, 408 (1909)),[42] that would arise

_____

[42]The "constitutional doubt rule" referred to in Jones instructs: "the rule, repeatedly affirmed, that 'where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, our duty is to adopt the latter.'" Jones, 526 U.S. at 239 (quoting Del. & Hudson Co., 213 U.S. at

85

were it to interpret the statute to treat the finding of "serious bodily harm" as a sentencing factor to be found by the judge rather than as an element of the offense that "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." Jones, 526 U.S. at 232.

After citing In re Winship, referred to above, the Jones Court reviewed the holdings in Mullaney v. Wilbur, 421 U.S. 684 (1975), Patterson v. New York, 432 U.S. 197 (1977), and McMillan v. Pennsylvania, 477 U.S. 79 (1986), focusing on the constitutional issues they presented. Jones, 526 U.S. at 240-42. In a footnote, the Court restated the principles that underlay its view that the carjacking statute, as construed by the Government, might violate the Constitution. It stated, inter alia: "The constitutional safeguards that figure in our analysis concern not the identity of the elements defining criminal liability but only the required procedures for finding the facts that determine the maximum permissible punishment; these are the safeguards going to the formality of notice, the identity of the factfinder, and the burden of proof." Id. at 243 n.6 (emphasis added).

The majority's description of the discussion of constitutional rights in Jones as "in the subsidiary context of the interpretative canon of avoidance," Maj. op. at 21, ignores the fact that the Court itself in Jones gave as the raison d'être of its statutory interpretation "the serious constitutional questions," id. at 251, that would arise under the Government's interpretation

408).

of the statutory language. In contrast to the majority's relegation of Jones to mere statutory interpretation and "not a statement of constitutional doctrine" regarding "the right to proof beyond a reasonable doubt," Maj. op. at 21, I note that this very language in Jones identifying "the constitutional safeguards," specifically including "the burden of proof" which led the Jones Court to its statutory construction, is quoted at length in the Booker constitutional opinion. Booker, 543 U.S. at 242. As the Court stated in Booker, a contrary holding in Jones "would have reduced the jury's role 'to the relative importance of low-level gatekeeping.'" Booker, 543 U.S. at 230 (quoting Jones, 526 U.S. at 244).[43]

Jones, with its affirmation of the principle that due process protections are required for offense-defining elements, was followed by Apprendi, a decision that even the majority states governs the constitutional issue before us. Maj. op. at 23. It states:

> This is a constitutional case, governed by the rule of *Apprendi*: the rights to a jury trial and to proof beyond a reasonable doubt attach to those facts that increase the statutory maximum punishment to which the defendant is exposed. 530 U.S. at 490.

---

[43] Any suggestion by the majority and the concurrence that Jones is no longer viable or relevant following Booker is belied by the prominent references to its holding in the opinion in Shepard v. United States, 544 U.S. 13, 24-26 (2005). I will discuss Shepard in more detail infra.

Maj. op. at 23.

In <u>Apprendi</u>, the Court distinguished between sentencing factors which a district court may find by a preponderance of the evidence when exercising its discretion to sentence within a given range, and those sentencing determinations for which due process demands a greater degree of procedural protection. The Court distinguished the determinations of sentencing factors, which it characterized as "factors relating both to the offense and offender," <u>Apprendi</u>, 530 U.S. at 481, from the determinations of what are usually characterized as elements of the offense, to which greater due process protections apply. As the Court stated:

> If a defendant faces punishment beyond that provided by statute when an offense is committed under certain circumstances but not others, it is obvious that both the loss of liberty and the stigma attaching to the offense are heightened; it necessarily follows that the defendant should not – at the moment the State is put to proof of those circumstances – be deprived of protections that have, until that point, unquestionably attached.

<u>Id.</u> at 484.

The Court continued, "[s]ince *Winship*, we have made clear beyond peradventure that *Winship*'s due process and associated jury protections extend, to some degree, 'to determinations that [go] not to a defendant's guilt or innocence, but simply to the length of his sentence.'" <u>Id.</u> (quoting <u>United States v. Almendarez-Torres</u>, 523 U.S. 224, 251 (1998) (Scalia, J., dissenting)). The Court then explained which facts are

88

entitled to the due process protections. In writing for the Apprendi majority on the constitutional issue, Justice Stevens quoted from his concurring opinion in Jones, where he wrote, "'[I]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt.'" (quoting Jones, 526 U.S. at 252-53 (Stevens, J., concurring)).

The holding of Jones that due process protections are required for offense-defining elements, as distinguished from sentencing factors, was the precedent on which the Supreme Court's decision in Apprendi was based. Apprendi pled guilty in state court to two counts of possession of a firearm for an unlawful purpose, and one count of unlawful possession of an antipersonnel bomb. Apprendi, 530 U.S. at 469-70. The State reserved the right to seek a higher enhanced sentence on the ground that one count of firearms possession was committed with a biased purpose in violation of N.J. Stat. § 2C:44-3, which was punishable by imprisonment for between ten and twenty years. Id. at 470. After a hearing, the state trial judge found by a preponderance of the evidence that Apprendi's crime was motivated by racial bias in violation of the state statute and enhanced Apprendi's sentence accordingly. Id. at 471. The finding doubled the maximum range within which Apprendi could be sentenced.

Although there was a "full evidentiary hearing" in the New Jersey court on whether Apprendi acted with a biased purpose, that issue was not presented to the jury. The Supreme Court thus stated, "The question whether Apprendi had a

constitutional right to have a jury find such bias on the basis of proof beyond a reasonable doubt is starkly presented." Id. at 475-76. The Court quoted from its earlier opinion in United States v. Gaudin, 515 U.S. 506 (1995), affirming that due process requires, inter alia, that a criminal defendant be afforded "'a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.'" Apprendi, 530 U.S. at 477 (quoting Gaudin, 515 U.S. at 510). The Court then noted that historically "[j]ust as the circumstance of the crime and the intent of the defendant at the time of commission were often essential elements to be alleged in the indictment, so too were the circumstances mandating a particular punishment." Apprendi, 530 U.S. at 480.

The Apprendi Court held that the New Jersey statutory scheme, allowing a judge to make a finding by a preponderance of the evidence that the defendant's "purpose" for unlawfully possessing the weapon was to intimidate his victim on the basis of race, was unconstitutional. Apprendi, 530 U.S. at 491-92. The Court rejected New Jersey's argument that the required "motive" finding was simply a "traditional" sentencing factor. Id. at 493-94. It continued, "[t]he degree of criminal culpability the legislature chooses to associate with particular, factually distinct conduct has significant implications both for a defendant's very liberty, and for the heightened stigma associated with an offense the legislature has selected as worthy of greater punishment." Id. at 495. Distinguishing Almendarez-Torres (which held evidence of prior convictions admissible without further proof), the Court stated:

> there is a vast difference between accepting the
> validity of a prior judgment of conviction entered

90

> in a proceeding in which the defendant had the right to a jury trial and the right to require the prosecutor to prove guilt beyond a reasonable doubt, and allowing the judge to find the required fact under a lesser standard of proof.

Id. at 496 (emphasis added).[44]

That statement alone is dispositive of this appeal. Grier's sentence was enhanced based on the District Judge's finding that Grier committed an aggravated assault despite the fact that no jury found that he had done so and no factfinder, not even the judge, so found beyond a reasonable doubt. The majority's only response to the reasoning in Apprendi set forth above, is "[l]ike the right to a jury trial, the right to proof beyond a reasonable doubt attaches only when the facts at issue have the effect of increasing the maximum punishment to which the defendant is exposed. *Apprendi*, 530 U.S. at 489-94. The advisory Guidelines do not have this effect." Maj. op. at 18-19. This, I respectfully state, is a non sequitur. If the decisions in Shepard v. United States, 544 U.S. 13 (2005), discussed infra, and Apprendi were not enough to dissuade the majority from what I believe is its mistaken path, then the Supreme Court's most recent opinion on the issue in Cunningham could not have been more clear. Under the California determinative sentencing law ("DSL") a defendant's sentence was determined by the tier in

---

[44]The finding by a preponderance of the evidence that Grier had committed an aggravated assault is in sharp contrast to Almendarez-Torres, where the underlying convictions followed findings made beyond a reasonable doubt.

91

which s/he fell. A defendant would fall within the upper tier only when the trial court determined that there were aggravating circumstances. The Supreme Court held that the middle tier, in which the defendant's sentence would fall in the absence of such aggravating circumstances, was to be regarded as "the relevant statutory maximum." Cunningham, 2007 WL 135687, at *11. Once again, the Court reiterated the applicable principles: "Because circumstances in aggravation are found by the judge and not the jury, and need only be established by a preponderance of the evidence, not beyond a reasonable doubt, . . . the DSL violates *Apprendi's* bright-line rule[.]" Id.

Apprendi, I emphasize, was not a statutory interpretation but a constitutional rule. The Court in Cunningham relied on Apprendi. The majority's attempt to distinguish Cunningham in its footnote: "The challenge before us is a Fifth Amendment challenge to an advisory sentencing scheme rather than a Sixth Amendment challenge to a mandatory sentencing scheme," Maj. op. at 18 n.6, is nothing short of bizarre. Does the majority really believe that the Fourteenth Amendment's incorporation of the Sixth Amendment, which was the basis for the Supreme Court's constitutional opinion in Apprendi, inter alia, does not apply equally to the Fifth Amendment?

The majority's interpretation of Apprendi leads it to establish the rule that "[o]nce a jury has found a defendant guilty of each element of an offense beyond a reasonable doubt, he has been constitutionally deprived of his liberty and may be sentenced up to the maximum sentence authorized under the United States Code without additional findings beyond a reasonable doubt." Maj. op. at 10.

92

The charge to which Grier pled guilty has a statutory maximum imprisonment term of 120 months, 18 U.S.C. § 924(a)(2), and no mandatory minimum. In the Presentence Report (PSR), the Probation Officer, after determining that Grier "used or possessed the firearm in connection with another felony offense (aggravated assault)," PSR, para. 14, and therefore was subject to a four-level enhancement pursuant to then-applicable U.S.S.G. § 2K2.1(b)(5), calculated that the appropriate Guidelines range for Grier's sentence (with a total offense level of 27 and a category V criminal history) was 120-150 months. The PSR also noted that without that four-level enhancement the appropriate sentencing range would be 84 to 105 months in prison.

At the sentencing hearing the District Court adopted the PSR, expressly using the preponderance-of-the-evidence standard in finding that Grier committed the "other felony offense," i.e. "aggravated assault." The Court made a downward departure under U.S.S.G. § 5K2.10 because the victim was partially responsible for the assault that was the basis for the enhancement, and sentenced Grier to 100 months in prison, with three years of supervised release.

According to the majority's analysis, because Grier was subject to a statutory maximum of 120 months and the District Court sentenced him to 100 months imprisonment, Grier's constitutional due process rights were not violated. However, the majority overlooks the fact that the District Court could have sentenced Grier at the low range of the advisory Guideline, i.e. to 84 months imprisonment. It is thus possible, and perhaps likely, that had the District Court recognized that the aggravated assault had to be proven beyond a reasonable doubt, it would

93

have sentenced Grier to no more than 84 months imprisonment. It is evident that the PSR calculation, adopted by the sentencing judge, increased the sentence to which Grier was exposed.

In Apprendi the Court stated:

The differential in sentence between what Apprendi would have received without the finding of biased purpose and what he could receive with it is not, it is true, as extreme as the difference between a small fine and mandatory life imprisonment. Mullaney, 421 U.S., at 700. But it can hardly be said that the potential doubling of one's sentence – from 10 years to 20 – has no more than a nominal effect. Both in terms of absolute years behind bars, and because of the more severe stigma attached, the differential here is unquestionably of constitutional significance. When a judge's finding based on a mere preponderance of the evidence authorizes an increase in the maximum punishment, it is appropriately characterized as "a tail which wags the dog of the substantive offense." McMillan, 477 U.S., at 88.

530 U.S. at 495.

In this case, the District Court's adoption of the preponderance-of-the-evidence standard, that the majority approves, and which exposed Grier to a year-and-a-half higher sentence than he may have otherwise received, had more than a "nominal" effect.

94

Moreover, the majority gives little or no effect to the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004), where the Court applied its earlier holding in Apprendi to a state's indeterminate sentencing regime and held that any fact that increased the sentence must also be submitted to a jury, even though this sentence would fall within the absolute maximum allowed by the statute. 542 U.S. at 303-04. Because Blakely held that "the 'statutory maximum' for Apprendi purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant,*" 542 U.S. at 303 (emphasis in original), any enhancement based on additional facts, even if the ultimate sentence is within the statutory range, as in Grier's case, violates both Apprendi and Blakely. Once again the Cunningham opinion speaks definitively to this issue. The Court reprised the facts in Blakely. Blakely had been convicted of second-degree kidnapping with a firearm, a class B felony under Washington law. Although Blakely was sentenced to 90 months' imprisonment, well within the overall statutory maximum of ten years for a class B felony, the Court held that the Washington State sentencing scheme violated the Sixth Amendment because the trial court could exceed the "standard range" of 49 to 53 months for "substantial and compelling reasons justifying an exceptional sentence." Cunningham, 2007 WL 135687, at *8 (internal citation and quotation omitted). As explained in Cunningham, "[t]he judge could not have sentenced Blakely above the standard range without finding the additional fact of deliberate cruelty. Consequently, that fact was subject to the Sixth Amendment's jury-trial guarantee. [Blakely,] 542 U.S. at 304-314. It did not matter, we explained, that Blakely's sentence, though outside

95

the standard range, was within the 10-year maximum for Class B felonies[.]" Id. at *8 (emphasis added). Thus the fact that the majority deems dispositive in this case, that Grier's sentence did not exceed the statutory maximum, is effectively repudiated by Cunningham.

Throughout its opinion the majority focuses on the language in the Booker remedial opinion, not on the Booker constitutional opinion. The Booker remedial opinion, authored by Justice Breyer, is addressed solely to the manner in which the requirements of the Booker constitutional opinion can be met. As the majority recognizes, the Booker Court's holding is limited to an analysis of the defendant's Sixth Amendment right to a jury trial. Booker offered no discussion of the Fifth Amendment, and to the extent that making the Guidelines advisory obviated the constitutional concerns raised in that case, it must be noted that there is a clear distinction to be drawn between Fifth and Sixth Amendment guarantees; the fact that rendering the Guidelines advisory remedied Sixth Amendment violations has little bearing on Fifth Amendment considerations. The issue before this court is whether, under the now-advisory Guidelines, the enhancement based on a judicial finding of fact (the commission of a separate felony) by the preponderance of evidence violated Grier's due process rights.

The majority opinion can be read to hold that as long as the sentence imposed is reasonable and within the statutory maximum, there is no constitutional issue. But nothing in the Booker remedial opinion, which adopts reasonableness as the standard for appellate review of the sentence imposed by a district court, suggests that "reasonableness" can be substituted for the constitutional requirement of a finding beyond a

96

reasonable doubt. In any event, none of the cases cited by the majority is binding on this court.[45] On the other hand, we are bound by the Supreme Court's decision in <u>Cunningham</u> where the Court made short shrift of the California Supreme Court's attempt "to rescue the DSL's judicial factfinding authority by typing it simply a reasonableness constraint, equivalent to the constraint operative in the federal system post-*Booker.*" <u>Cunningham</u>, 2007 WL 135687, at *14. The Court stated, "Reasonableness, however, is not, as [the California Supreme Court] would have it, the touchstone of Sixth Amendment analysis. The reasonableness requirement of *Booker* anticipated for the federal system operates *within* the Sixth Amendment constraints delineated in our precedent, not as a substitute for those constraints." <u>Id.</u>

Finally, the majority derides the suggestion that because the aggravated assault constitutes a separate offense, it is an element of a crime and therefore requires that the court make a finding of the commission of that offense beyond a reasonable doubt. <u>See</u> Maj. op. at 24. Once again the majority ignores the holding in <u>Apprendi</u> where the Supreme Court's decision was

---

[45]Many of the cases cited by the majority concern findings relating to sentencing facts, which, as <u>Booker</u> held, have historically been left to the sentencing judge's discretion and which <u>Apprendi</u> held can be established by a preponderance of the evidence. <u>See, e.g.</u>, <u>United States v. Okai</u>, 454 F.3d 848, 851-52 (8th Cir. 2006); <u>United States v. Dare</u>, 425 F.3d 634, 642 (9th Cir. 2005); <u>Cirilo-Munoz v. United States</u>, 404 F.3d 527, 532-33 (1st Cir. 2005).

97

based on the fact that the enhancement to Apprendi's crime for possession of a firearm for an unlawful purpose was based on "a separate statute," the hate crime law. Apprendi, 530 U.S. at 468. The majority's statement that "[f]acts relevant to application of the Guidelines – whether or not they constitute a 'separate offense'," do not constitute "'elements' of a 'crime'," and do not implicate the right to "proof beyond a reasonable doubt," Maj. op. at 24, simply wipes away the entire holding of Apprendi.

In summary, not one of the reasons given by the majority for its holding withstands analysis. With no precedent and no persuasive rationale for its discard of the beyond-a-reasonable-doubt standard, the majority's decision represents a regrettable erosion of a criminal defendant's constitutional right to due process, an erosion that I can only hope will be of short duration.[46]

## III.

Grier's second argument on appeal is that the record does not support a finding that he committed an aggravated assault, regardless of which standard of proof is used.[47] Although I agree

---

[46]Appellant and the amici have included in their briefs various broad challenges to the Sentencing Guidelines and cases interpreting them that go far beyond the issue presented in this case. I have not considered nor discussed them because they may deflect attention from the important, albeit narrow, constitutional issue before us.

[47]Grier also contends that the District Court erred by failing to articulate its consideration of the factors set forth in 18

with the majority that we must review particular factual determinations made by the District Court in the context of sentencing for clear error, I dissent from the majority's determination to remand this case for resentencing because the majority persists in its approval of the enhancement. Instead, I would remand to require the District Court to resentence without any enhancement based on the District Court's determination that Grier committed an aggravated assault.

Even if the majority were convincing that the appropriate standard of proof is preponderance of the evidence, the District Court clearly erred in finding that Grier committed an aggravated assault which was the basis for the sentencing enhancement. United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999). In Shepard v. United States, 544 U.S. 13 (2005), the Supreme Court spoke emphatically on the type and quantum of evidence required before a prior crime may be used as a predicate offense. Shepard (just as Grier in this case) had pled guilty to being a felon in possession of a firearm, i.e. the offense of conviction. The Government sought to enhance his sentence under the Armed Career Criminal Act, 18 U.S.C. § 924(e) ("ACCA"), applicable to, inter alia, persons who had three prior convictions for violent felonies. Some fifteen years earlier, in Taylor v. United States, 495 U.S. 575 (1990), the Court had

---

U.S.C. § 3553(a) in determining Grier's sentence, making the sentence unreasonable. Because I distinguish between sentencing factors, the subject of § 3553, which are not at issue here, and offense- defining factors which are the subject of this dissent, I need not discuss Grier's contention.

decided that the only burglary that was a violent felony under the ACCA was generic burglary. Shepard, unlike Taylor, had not been tried for burglary but had pled guilty. There was no written plea agreement or transcript of plea colloquy, and he had not assented to any explicit factual finding by the trial judge. Because the offenses charged against Shepard were broader than generic burglary, the Court of Appeals held that the police reports may count as "sufficiently reliable evidence" to determine the nature of the prior crime. Shepard, 544 U.S. at 18 (internal citation and quotation omitted). The Supreme Court reversed.

In considering what would constitute an adequate judicial record of the prior crime, the Court referred to Taylor where the Court held that the qualifying "burglary" could be proven only by either a statutory definition substantially corresponding to generic burglary or by showing that the charging documents and jury instructions required the jury to find all the elements of generic burglary. Taylor, 495 U.S. at 602. The Shepard Court added that in cases without a jury the prior crime could be evidenced by a bench-trial judge's formal rulings of law and findings of fact and in cases disposed of by plea agreements, by a "statement of factual basis for the charge, . . . shown by a transcript of plea colloquy or by written plea agreement presented to the court, or by a record of comparable findings of fact adopted by the defendant upon entering the plea." Shepard, 544 U.S. at 20. The Court rejected the Government's argument that it should expand the evidence by considering a police report submitted to a local court as grounds for issuing a complaint. That, according to Shepard, would not satisfy the necessary

certainty of the record. The opinion stresses throughout the need for certainty as to the basis for the predicate conviction.

The Court stated that because there was no plea agreement or recorded colloquy in which Shepard admitted the fact at issue,

> the sentencing judge considering the ACCA enhancement would (on the Government's view) make a disputed finding of fact about what the defendant and state judge must have understood as the factual basis of the prior plea, and the dispute raises the concern underlying *Jones* and *Apprendi*: the Sixth and Fourteenth Amendments guarantee a jury standing between a defendant and the power of the state, and they guarantee a jury's finding of any disputed fact essential to increase the ceiling of a potential sentence.

Id. at 25.

If the record in Shepard, where the defendant had pled guilty to the offense which the Government sought to use as an enhancement, was an insufficient basis on which to hinge the predicate crime, how can the majority possibly base Grier's enhancement on commision of an offense (aggravated assault) for which he was never charged, which he never admitted, and on which he was never tried? Surely, the aggravated assault that was the basis of Grier's sentencing enhancement is the equivalent of the predicate crimes under the ACCA with which Shepard was concerned. And, Shepard also confirms the significance of my focus on the standard of proof of the separate crime, a focus that is the subject of the majority's scorn.

101

There is no basis under Pennsylvania law to levy on Grier a charge of aggravated assault and no basis in the evidence to make a finding that Grier committed that offense. The evidence at the sentencing hearing consisted only of the testimony from Juan Navarro, the brother of Grier's girlfriend, with whom Grier engaged in the altercation that constituted the basis for the District Court's finding of aggravated assault. Navarro testified that he [Navarro] "swung first," i.e., that he was the first aggressor in the altercation. App. at 51; Tr. at 10, l. 1. He testified that he and Grier then "started rolling around on the ground." App. at 56. Navarro testified that the gun initially went off while they were struggling on the ground:

> We started fighting. And the people surrounding us was [sic] saying that he had a gun and all that, and they tried to get the gun from him and all. And then a shot fired. Then we just separated. And then after that, he just pointed the gun at me, and then it went – I started – I kept going after him. And then people was just holding me back, and then he went from there where he was gonna go, and then stopped. The fight just stopped right there.

Id. at 51; Tr. at 10, l. 13.

Navarro further testified on cross-examination that he did not know how the gun had gotten out of Grier's pocket: "I don't know if the gun fell out or whatever. People was telling me that he was taking the gun out. And from there, that's when everybody tried to get the gun away from him." App. at 57; Tr. at 16, l. 3.

102

Navarro testified that after the two had separated, Grier pointed the gun at him, but Navarro "was trying to go back at him" when onlookers held him back. At that point, Grier "shot in the air." App. at 58; Tr. at 17, l. 18. After that, Navarro testified that they "both walked away. He went his way and I went my way." App. at 59; Tr. at 18, l. 13.

Under Pennsylvania law, a person commits an aggravated assault when, inter alia, s/he "attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon." 18 Pa. Cons. Stat. § 2702(a)(4). In this case, there is no evidence that Grier had the requisite intention and the evidence does not show that he ever fired the gun at Navarro. The first time the gun went off, Grier and Navarro were engaged in a struggle on the ground, while bystanders were also trying to wrestle the gun away from Grier. Therefore, there was no evidence to support a charge of aggravated assault.

In contrast, "[s]imple assault by physical menace" is defined under Pennsylvania law as an "attempt by physical menace to put another in fear of imminent serious bodily injury," 18 Pa. Cons. Stat. § 2701(a)(3), and includes pointing a gun at someone without firing it. The District Court interrupted the District Attorney's statement that Grier pointed the firearm at Navarro by saying, "I don't think there's any testimony he pointed it at him." App. at 68. Even Navarro's testimony that Grier pointed the gun at him never suggested that Grier attempted to put him in fear of imminent serious bodily injury and he stated immediately thereafter that Grier fired the gun in the air in order to end the fight. He obviously so understood it, and the District Court did not state otherwise.

103

At most, the facts on the record support a charge of simple assault by mutual consent, which, under Pennsylvania law, is only punishable by up to one year in prison. See 18 Pa. Cons. Stat. §§ 2701(b)(1), 1104(3). Simple assault by mutual consent cannot support application of a four-level enhancement under former U.S.S.G. § 2K2.1(b)(5)[48] because it does not meet the requirement for a "felony offense," which is defined as "any offense (federal, state, or local) punishable by imprisonment for a term exceeding one year, whether or not a criminal charge was brought, or conviction obtained." U.S.S.G. § 2K2.1 cmt. 4 (2005).

The Pennsylvania statute defines aggravated assault in the alternative – the defendant must have attempted to or intentionally caused bodily injury with a deadly weapon. There is no suggestion that Grier actually injured Navarro with the gun. Therefore, the District Court's conclusion that Grier committed an aggravated assault by a preponderance of the evidence must have been based on the finding that it was more likely than not that Grier attempted to cause bodily injury to Navarro with the gun. See 18 Pa. Cons. Stat. § 2702(a)(4). Yet the majority chooses to ignore the copious evidence that Navarro was the aggressor and that Grier was acting only in self-defense. Navarro's testimony confirms that when Grier stepped away from Navarro and fired a shot in the air he was seeking to end the fight. App. at 59. Firing in the air is not a

_____

[48]In the November 2006 edition of the Guidelines, this provision now appears at § 2K2.1(b)(6), with an analogous and corresponding application note at 14(C).

mysterious gesture as the majority chooses to portray it, but can fairly be described as a universally understood gesture of detente or warning. Navarro so understood it. In fact, state charges filed against Grier after the incident were dismissed.

> The majority states:
>
> It is arguable – and is argued by Grier on appeal – that the record shows that the gun accidentally dropped from his pocket during the altercation, and that his subsequent actions were intended merely to dissuade Navarro from continuing the fight. But the District Court found that Grier intentionally pulled the gun from his clothing and, while the two men were on the ground, fired a shot in an attempt to harm or kill Navarro. He thereafter rose and aimed the gun once again at Navarro but, for whatever reason, decided to fire the weapon skyward and withdraw from the fight.

See Maj. op. at 30. The District Court never found Grier "fired a shot in an attempt to harm or kill Navarro." That is a figment of the majority's imagination.

By stating that it is "arguable" that the record shows that the gun accidentally dropped from Grier's pocket, the majority in effect concedes that the District Court erred in finding, even by a preponderance of the evidence, that Grier committed an aggravated assault. The only basis for the sentence imposed by the District Court was its statement that it "adopts the pre-sentence report." App. at 80. I submit that after Shepard, a presentence report without more cannot be the basis for a

105

finding of an offense that is the predicate for a sentence enhancement.

The District Court itself acknowledged Navarro's responsibility for the altercation by departing downward two levels due to the victim's partial responsibility under U.S.S.G. § 5K2.10. If the District Court believed that Navarro was responsible for the altercation, it should have given closer consideration to Grier's claim of self-defense, which is a complete defense to aggravated assault under Pennsylvania law, and which, as Grier argued at sentencing, could also reduce the predicate offense to simple assault by mutual consent. See 18 Pa. Cons. Stat. § 2701(b)(1). The majority ignores the fact that under Pennsylvania law simply pointing a gun at someone without firing it is not an aggravated assault, but a simple assault by physical menace, to which the mutual consent exception applies. See Commonwealth v. Matthews, 870 A.2d 924, 929 (Pa. Super. 2005); 18 Pa. Cons. Stat. § 2701(a)(3).

The majority concludes that the District Court did not err in finding that Grier had committed an aggravated assault based on the barest evidence to support his charge in the record. Although the majority actually adopts the clear error standard, which requires us to reverse a District Court's finding of fact as clearly erroneous "'when although there is evidence to support it, [we] are left with the definite and firm conviction that a mistake has been committed,'" Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 622 (1993) (quoting United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948)), the majority fails to apply this standard to the facts on record.

106

Its statement that "[t]he precise circumstances of the fight are matters of reasonable speculation," Maj. op. at 30, is inconsistent with its affirmation of the District Court's finding that Grier committed an aggravated assault, even by its own standard using a preponderance of the evidence. I would remand to the District Court for resentencing without the four point enhancement for commission of another offense.

McKEE, *Circuit Judge*, dissenting, with whom Judge Sloviter joins.

As Judge Ambro poignantly notes, Sean Michael Grier "is in prison in part for a crime for which he was never indicted, never tried, and never convicted." Con. Op., *supra*, at 37 (Ambro, J. concurring). Nevertheless, he joins the result reached by the majority because he concludes the Supreme Court precedent he so ably discusses requires that result. It is certainly true that we are bound by prior decisions of the Supreme Court, even though they may now be in tension with *Apprendi* and its progeny. *See* Con. Op.,*supra*, at 41 (citing *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997)) (Ambro, J. concurring). However, as I explain below, and as Judge Sloviter so ably explains, Supreme Court precedent undermines the majority's analysis, it does not support it.

I write separately to explain why I join Judge Sloviter in dissent rather than join Judge Ambro's thoughtful concurrence, and to explain why I believe that the Fifth Amendment does not allow a sentencing court to enhance a sentence pursuant to U.S.S.G. § 2K2.1(b)(5) when the Government only establishes

107

that the defendant committed an uncharged felony by a preponderance of the evidence.

## I.

In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court stated, "any fact (other than a prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 476 (citation omitted). The Court later characterized this as a "bright-line rule." *See Blakely v. Washington*, 542 U.S. 296, 308 (2004).

In *Blakely*, the Supreme Court rejected the state's contention that the rule of *Apprendi* was not violated because the defendant's sentence was less than the statutory maximum allowed under the state's criminal code. The Court defined "statutory maximum" as follows:

> Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of facts reflected in the jury verdict or admitted by the defendant*. In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional finding. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts which the law makes essential to the punishment and the judge exceeds his proper authority.

*Blakely*, 542 U.S. at 303 (citation omitted) (quotation omitted) (emphasis in original). The Court's pronouncement referred to the Sixth Amendment because, as the majority notes, that was the issue before the Court. However, constitutional guarantees can not be neatly quarantined in the manner suggested by the majority's failure to recognize the Fifth Amendment implications of *Blakely*. The majority's sequestration of these constitutional provisions improperly restricts the operation of the Fifth Amendment's Due Process Clause and contravenes the Court's analysis in *Jones v. United States*, 526 U.S. 227 (1999). There, the Court stated, "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.* at 243 n.6.[49]

As my colleagues in the majority explain, *Booker* modified the Sentencing Reform Act of 1984 ("SRA"), Pub. L. No. 98-473, 98 Stat. 1837, 1987 (1984), by severing two provisions: 18 U.S.C. §§ 3553(b)(1) (requiring courts to impose a sentence within the applicable Guidelines range) and 3742(e) (prescribing standards of review on appeal, including *de novo*

---

[49]As Judge Sloviter explains, the majority ignores the constitutional impact of *Jones* by dismissing it on the basis that "*Jones* was a statutory interpretation case." Maj. Op.,*supra*, at 21. Given Judge Sloviter's rejoinder to the majority's view of *Jones*, I need not elaborate on why *Jones* is relevant to our inquiry.

review of departures from the relevant Guidelines range). *United States v. Booker*, 543 U.S. 220, 258-59 (2005). "Excising" these sections morphed the previously mandatory Guidelines into advisory Guidelines. *Id.* at 259. As the *Booker* Court explained, "without . . . the provision that makes the relevant sentencing rules mandatory and imposes binding requirements on all sentencing judges [] the statute falls outside the scope of *Apprendi*'s requirement." *Id.* (internal quotations omitted).

Relying upon this judicially-spawned metamorphoses, the majority holds that the Fifth Amendment requires only that a jury find "each element of an offense beyond a reasonable doubt," and concludes that a defendant "may be sentenced up to the maximum sentence authorized under the United States Code without additional findings beyond a reasonable doubt." Maj. Op., *supra*, at 10. The resulting sentencing scheme harkens to the pre-Guidelines regime where "district courts ha[d] discretion to sentence anywhere within the ranges authorized by statute." *Booker*, 543 U.S. at 305 (Scalia, J. dissenting). Although the current operation of the Guidelines "harkens back" to that era, it is clear that *Booker*'s remedial opinion does not reintroduce the pre-Guidelines sentencing regime. Rather, *Booker* makes clear that even "[w]ithout the 'mandatory' provision, the [SRA] . . . requires judges to take account of the Guidelines together with other sentencing goals." *Id.* at 259.

The majority's analysis assumes that scrutiny of the operation of a particular Guideline in a given case is pointless because the Guidelines no longer have "the force and effect of laws[.]" *Booker*, 543 U.S. at 234. This case shows the error of such an oversimplification of the operation of the Guidelines

110

after *Booker*. Given what happened to Grier, it should be apparent that considerations of due process do not cease merely because the Guidelines are deemed advisory. Although advisory in fact, they remain at the center of the sentencing process, and continue to have a predominant role in determining the sentence that is imposed. *See Booker*, 543 U.S. at 259; *see also United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006).

We have, of course, recently held that a sentence post-*Booker* does not withstand appellate review for reasonableness merely because it is within the applicable Guideline range. *See United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006). Although our discussion in *Cooper* reinforces the advisory nature of the Guidelines, it does not alter the fact that application of a particular Guideline can increase the defendant's exposure based upon facts not found by a jury or proven beyond a reasonable doubt. This is such a case.

A.

My colleagues in the majority find solace in the fact that the holding here "accords with the decisions of each of our sister circuits that has addressed this issue." Maj. Op., *supra*, at 20. I am not nearly as comforted by that fact as they. As I have noted elsewhere, "before *Booker* was decided, one could have developed an even more impressive list of the courts that had incorrectly concluded that *Apprendi* does not apply to the federal sentencing guidelines." *United States v. Leahy*, 438 F.3d 328, 345 (3d Cir. 2006) (McKee, J. dissenting).

It is axiomatic that when the Sixth Amendment requires fact finding by a jury, the Fifth Amendment requires proof beyond a reasonable doubt. However, when a defendant

111

knowingly waives the Sixth Amendment right to a jury trial—either by knowingly and voluntarily agreeing to a bench trial or by pleading guilty—the Fifth Amendment guarantee is not automatically waived for all purposes. Grier waived his Sixth Amendment right to a jury trial when he pled guilty. This fact, however, does not place him beyond the reach of the Fifth Amendment's protection against being punished for a crime unless guilt is established beyond a reasonable doubt.

As Judge Sloviter notes, one of the fundamental reasons for a heightened standard of proof in criminal trials is "the comparative . . . costs of erroneous factual determinations." Dis. Op., *supra*, at 76 (quoting *In Re Winship*, 397 U.S. 358, 369-70 (1970) (Harlan, J. concurring)). Due process concerns persist if the sentence imposed includes punishment for an uncharged crime that has only been established by a preponderance of evidence during a guilty plea colloquy. Judge Sloviter reminds us that the Supreme Court, in *Ring v. Arizona*, 536 U.S. 584, 602 (2002), proclaimed: "if a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." Dis. Op., *supra*, at 78.

My colleagues in the majority believe that "there is every reason to believe that the Supreme Court intended that the practices that have guided us and other courts in the twenty years since the Guidelines were first promulgated would continue to govern sentencing in the federal courts." Maj. Op., *supra*, at 9. However, they either ignore or misconstrue those traditional practices, and they ignore those practices that guided

112

the exercise of sentencing discretion even before the Guidelines were enacted.

No one would doubt that the sentencing process has traditionally required sentencing judges to consider factors and circumstances that are as numerous as they are varied. The exercise of the broad discretion endemic to the sentencing process demands that the judge know as much about the offender, the offense, and the impact of the offense on the community and victim as practical given the limitations inherent in any judicial proceeding. Accordingly, no one would dispute that it is essential for a sentencing judge to have "'the fullest information possible concerning the defendant's life and characteristics'" in deciding upon an appropriate sentence. *United States v. Watts*, 519 U.S. 148,152 (1997) (quoting *Williams v. New York*, 337 U.S. 241, 247 (1949)).

We all appreciate that *Booker* returned to sentencing judges much of the discretion that they had exercised before the advent of the SRA and the Sentencing Guidelines. *Booker*, 543 U.S. at 264. Those Guidelines (like other guideline schemes adopted in many states before and after the SRA), resulted from legislative efforts to bring a degree of uniformity and predictability to the sentencing process while eliminating many of the troubling sentencing disparities that had so often been criticized. *Mistretta v. United States*, 488 U.S. 361, 365 (1989) (explaining that Congress intended with the SRA to eliminate "[s]erious disparities in sentencing" and the "uncertainty as to the time the offender would spend in prison.").

After *Booker*, the sentencing factors in 18 U.S.C. § 3553(a) control sentencing discretion, and the Guidelines are, in

113

theory, but one of those factors.[50]  However, that does not mean

---

[50]These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed–

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . issued by the Sentencing Commission[;] . . .

(5) any pertinent policy statement . . . issued by the Sentencing Commission[;] . . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records

114

that all of those factors are equal in practice. Grier's sentence illustrates how the Guidelines are now *first* among equals, and how that primacy can, in limited situations, collide with the Fifth Amendment's guarantee of due process.

In *United States v. Gunter*, 462 F.3d at 247, we set forth the three-step process district courts must engage in when imposing a sentence after *Booker*. The first step in that process is that "[c]ourts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*." *Id.* In order to calculate a defendant's Guideline range properly, the sentencing judge must—at the second step—rule on motions for departures and state how any departure "affects the Guidelines calculation." *Id.* Finally, upon reaching the third step, and only upon reaching the third step, "[sentencing courts] are required to 'exercise . . . discretion by considering the [other] relevant [i.e., 18 U.S.C. § 3553(a)] factors.'" *Id*. (quoting *United States v. King,* 454 F.3d 187, 194 (3d Cir. 2006)).

The sentence derived from this three-step process must be imposed "regardless [of] whether it varies from the sentence calculated under the Guidelines." *Gunter*, 462 F.3d at 247. Nevertheless, the exercise of judicial discretion, which the majority rests so much of its argument upon, is driven by the

who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

115

initial Guidelines calculation at step one. That calculation is the "strong force" that defines the starting point for all that follows. In doing so, it necessarily impacts—and often defines—the ending point. That starting point determines the sentence that is imposed even after the sentencing court has exercised its new-found discretion and factored in any upward or downward departures based upon its Guideline calculations.[51] The Guidelines are thus the point of departure for any and all adjustments based upon the "sentencing factors" incorporated into § 3553(a).

Here, Grier's sentencing range at the first step was 84 to 105 months without enhancements. However, after hearing the victim's testimony, the sentencing court concluded that the

---

[51]Specifically, the Court in *Booker* explained that judges were to:

> consider the Guidelines sentencing range established for the applicable category of offense committed by the applicable category of defendant, the pertinent Sentencing Commission policy statements, the need to avoid unwarranted sentencing disparities, and the need to provide restitution to victims[,] . . . impose sentences that reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, protect the public, and effectively provide the defendant with needed educational or vocational training and medical care. *Booker*, 543 U.S. 259-60.

Government had established by a preponderance of the evidence that Grier had committed an aggravated assault (as defined in Pennsylvania by 18 Pa. Cons. Stat. Ann. § 2702(a)) during the commission of the offense he was pleading guilty to. Accordingly, the sentencing court applied a four-level enhancement as required under U.S.S.G. § 2K2.1(b)(5).

The majority's failure to appreciate the operation of 2K2.1(b)(5) in this context turns a blind eye to the inherent tension between the advisory nature of the Guidelines on the one hand, and their real-world application on the other. The Guideline calculation (required as the first step in the three-step process outlined in *Gunter*) will often have a far greater impact on the ultimate sentence a defendant receives than either of the other two steps of the sentencing process; perhaps even more than the other two steps combined.[52] Therefore, the following should come as no surprise:

> The majority of federal cases continue to be sentenced in conformance with the [Guidelines].

---

[52]These concerns are in no way intended to undermine *Booker* or *Gunter*. Rather, my observations are merely intended to explain how the application of the Guidelines can result in punishment for an uncharged crime without the constitutionally required level of certainty when the Guidelines include an enhancement such as the one at issue here. The problem can be easily resolved within the *Booker*/*Gunter* framework by requiring any such crime to be established beyond a reasonable doubt as the court considered doing during the sentencing hearing.

117

National data show that when within-range sentences and government-sponsored, below-range sentences are combined, the rate of sentencing in conformance with the sentencing guidelines is 85.9%. This conformance rate remained stable throughout the year that followed *Booker*.

U.S. Sentencing Comm'n, *Report on the Impact of* United States v. Booker *On Federal Sentencing,* 18 Fed. Sent. R. 190, 192 (2006).[53]

---

[53]Clearly, it would be premature to lean too heavily on these numbers from the Sentencing Commission. It is certainly possible that sentences will begin to diverge from Guideline ranges as judges become more comfortable with exercising their discretion based upon their assessment of the effect of the other sentencing factors in § 3553(a). Nevertheless, we can not lightly dismiss these statistics as we consider the post-*Booker* operation of the Guidelines.

The majority notes that the Guidelines merely "inform the district court's discretion without limiting its authority." My colleagues conclude that the Guidelines "therefore do not constitute 'elements' of a 'crime' under the rationale of *Apprendi* and do not implicate the rights of a jury trial and proof beyond a reasonable doubt." Maj. Op., *supra*, at 24 (citing *Apprendi*, 530 U.S. at 490.). Unless and until the Supreme Court instructs otherwise, I can not help but conclude that such an approach can elevate theory over liberty in certain situations.

Here, the sentencing judge meticulously computed the sentencing range under the Guidelines, and articulated those calculations with precision. She explained her consideration of the 3553(a) factors as follows: "The Court believes that 100 months is reasonable in view of the considerations of section 3553(a)." My colleagues and I agree that the explanation given is no explanation at all, and that a remand is required. However, requiring more detailed explanations of the sentencing factors under § 3553(a) will not negate the primacy of the Guideline calculation.

Here, the sentencing judge's determination that Grier committed a separate crime of aggravated assault raised Grier's Guidelines range from 84 to 105 months to 120 to 150 months. Accordingly, the latter range became the starting point for the exercise of the sentencing judge's discretion, not the range that would have guided that discretion absent the finding that he committed an uncharged aggravated assault. Not surprisingly, Grier's sentence fell within the Guidelines-determined range, even after the sentencing judge exercised her discretion under 18 U.S.C. § 3553(a).

I simply can not agree that the Fifth Amendment's guarantee of Due Process is not implicated by that calculus given the definition of "statutory maximum" that pertains after *Blakely*. The finding of an aggravated assault and the concomitant elevation of the sentencing range exposed Grier to a longer period of imprisonment than the facts he admitted during the Rule 11 colloquy. Nothing on this record even faintly suggests that Grier would have received as severe a sentence had he not been "convicted" of an uncharged aggravated assault,

119

the existence of which was only established by a preponderance of the evidence.[54]

The majority is not troubled by this increase in Grier's sentence because my colleagues' analysis is driven by the conclusion that Grier's guilty plea "exposed" him to the statutory maximum of 120 months for the illegal possession of a firearm. However, as Judge Sloviter explains, absent the finding that Grier committed an aggravated assault, the sentencing judge "could have sentenced Grier at the low range of the advisory Guideline, i.e.[,] to 84 months imprisonment." Dis. Op., *supra*, at 93. The court also may have sentenced him to less than the low end of that Guideline range. Grier's increased "exposure" is not based upon his character, his conduct, or the circumstances of the offense he pled guilty to. Although the majority apparently believes that the aggravated assault was merely a circumstance surrounding the commission of his crime, those circumstances would have been exactly the same absent a finding that his conduct amounted to a felony under U.S.S.G. § 2K2.1(b)(5).

---

[54]For purposes of this discussion, I will assume that this record is sufficient to prove an aggravated assault. However, I join Judge Sloviter's discussion of that evidence. Although Grier had a gun, he fired it into the air, not at Navarro, even though he was attacked by Navarro. Accordingly, this record establishes nothing more than a simple assault by physical menace as defined in 18 Pa. Cons. Stat. § 2701(a)(3), as Judge Sloviter explains. *See* Dis. Op., *supra*, at 103-05.

120

The sentencing court's conclusion that Grier's conduct constituted an aggravated assault under Pennsylvania law changed nothing about Grier, or the circumstances of the offense. It did not alter his culpability, or remorse or increase the need to deter others, protect the public, punish Grier, or increase his threat to the community. Any sentencing judge could assess those factors from his conduct and his background. The finding that he committed the felony of aggravated assault did, however, drastically impact his sentence. It *required* the sentencing court to apply whatever discretionary "break" it was going to "cut him" to a higher sentencing range than would have otherwise applied. The fact that the court could exercise its discretion to depart downard (as it did), because of the victim's conduct does not alter the fact that the departure started from a higher range, and thus finished in a higher range, than would have been appropriate otherwise. The additional "circumstance" of the aggravated assault is therefore not just another sentencing factor.

It is certainly defensible from a policy standpoint that one's sentence should be further enhanced if the circumstances of his/her crime, themselves, constitute another crime. However, when that is the sentencing consideration, the Fifth Amendment requires that "crime" to be established the same as any other crime: by proof beyond a reasonable doubt. If "sentencing factors" are to be transformed into "elements" of an uncharged crime, those "elements" must be proven the same as the elements of any other crime before they can impact the defendant's liberty.

121

B.

Tracking Supreme Court precedent through the constitutional thicket of sentencing discloses that 18 U.S.C. § 3553(a) codifies factors that have historically guided judicial discretion in sentencing. Indeed, almost fifty years before Congress enacted § 3553(a), the Court explained in *Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51 (1937), that a state:

> may inflict a deserved penalty merely to vindicate the law or to deter or to reform the offender or for all of these purposes. For the determination of sentences, justice generally requires consideration of more than the particular acts by which the crime was committed and that there be taken into account the circumstances of the offense together with the character and propensities of the offender. His past may be taken to indicate his present purposes and tendencies and significantly to suggest the period of restraint and the kind of discipline that ought to be imposed upon him.

*Id.* at 55; *Solem v. Helm*, 463 U.S. 277, 286 (1983) ("The constitutional principle of [sentencing] proportionality has been recognized explicitly in this Court for almost a century.")*; see also* Richard S. Frase, *Punishment Purposes*, 58 Stan. L. Rev. 67, 82 (2005) (explaining the rationales behind the subsections

of § 3553(a), including the endorsement of "proportionality values.").[55]

Thus, factors such as whether a defendant brandished or fired a gun during the course of the offense of conviction, or whether he/she threatened or injured someone have, of necessity, traditionally had "a substantial impact" on selecting an appropriate sentence from within the range of punishment authorized by a legislature upon conviction for a charged offense. *See Harris v. United States*, 536 U.S. 545, 549 (2002). Absent a legislatively mandated sentence of determinate length, judges could hardly do anything other than base a sentence upon the "special features of the manner in which the . . . basic crime could be carried out," and the offender who carried it out. *Id.* at 554 (quotations omitted) (citing *Castillo v. United States,* 530 U.S. 120, 126 (2000)).

Although the distinction between sentencing factors and elements of a crime has lead to no small amount of confusion as Congress and state legislatures have enacted mandatory sentencing enhancements, it remains clear that the factors that must be considered under § 3553(a) pertain to the kind of historic sentencing factors exemplified by considerations that assess the offender's risk to the community, employability,

---

[55]We made a similar point in *Cooper*, 437 F.3d 324 (3d Cir. 2006), noting: "Pre-guidelines sentences were based on the facts of the crime, the criminal history of the defendant, the defendant's personal characteristics, the applicable statutory law, and general penological goals and principles. These are all found in 18 U.S.C. §§ 3553(a)(1), (2), and (3)." *Id.* at 326 n.2.

susceptibility to rehabilitation and (more recently), the need for substance abuse treatment or counseling. When the latter consideration is present, sentencing judges historically relied upon many of the same sentencing factors incorporated into § 3553(a) to choose between inpatient and outpatient treatment. Obviously, a sentencing factor can not be relied upon until a court finds that the factor is present.

In *Harris*, the Supreme Court emphasized that this traditional "[j]udicial factfinding in the course of selecting a sentence within the authorized [Guideline] range does not implicate the indictment, jury-trial and reasonable-doubt components of the Fifth and Sixth Amendments." *Harris*, 536 U.S. at 558. In *Harris* and *McMillan v. Pennsylvania*, 477 U.S. 79 (1979), the Court concluded that the Constitution is not offended by the historical manner in which judges have gone about fact finding that inform the appropriate exercise of judicial discretion at sentencing. Therefore, legislatures could identify certain sentencing factors and determine the weight those factors were to be given in selecting an appropriate sentence. That is what distinguishes *Harris* and *McMillan* from *Apprendi* and its progeny.[56]

---

[56]By reconciling *Harris* and *McMillan* with the *Apprendi* line of cases, I do not intend to minimize the tension in that line of jurisprudence that Judge Ambro alludes to. Nevertheless, as Judge Ambro states, until the rapidly-evolving law of sentencing under the Fifth and Sixth Amendments resolves, I agree that we must attempt to interpret the *Apprendi* jurisprudence in a manner that reconciles the Court's pronouncements. However, I do not

The instant case, however, is not a situation where the judge relied upon traditional sentencing factors relevant to the defendant's character or the offense of conviction to decide upon an appropriate sentence. Rather, the judge here relied upon a finding that Grier committed the crime of aggravated assault during the commission of the crime to which he pled guilty. Marshaling the underlying facts into elements of an uncharged crime goes beyond the traditional use of sentencing factors. It does more than punish Grier for the *manner* in which he illegally possessed the gun; it punishes him for a crime the Commonwealth of Pennsylvania never saw fit to charge him with.[57]

My colleagues view this as a distinction without a difference. Given their constitutional analysis, they merely view the aggravated assault as conduct that the court could consider in sentencing. Indeed, the court could have, and should have, considered all of Grier's conduct when deciding upon a sentence. Whatever adjustment the sentencing judge would have made to the Guideline calculation based upon Grier's

---

agree that resolution of tension within the Court's jurisprudence supports the majority's position.

[57]Indeed, given the majority's ruling that only a preponderance of the evidence is required to punish him for that crime, and the marginal nature of Navarro's testimony, the decision to forgo prosecution for the purported felony and simply punish Grier for it by enhancing his sentence for the uncharged crime appears a wise decision, although of questionable constitutionality.

conduct or character would have operated on the Guideline range of 84 to 105 months that is set forth for the offense of illegally possessing a firearm. However, the sentencing court did more. The sentence it selected was intended to punish Grier for an aggravated assault that he was never convicted of. That is very different—both in terms of the potential sentence, and in terms of the Fifth Amendment—than what sentencing courts traditionally have used to inform sentencing decisions.[58]

In noting that the Sixth Amendment guarantee of a jury trial and the Fifth Amendment guarantee of due process of law "stand as a bulwark of individual liberty," Maj. Op., *supra*, at 10, my colleagues in the majority acknowledge that the "principle is rooted in common law considerations of fundamental fairness." *Id.* (citing *Blakely,* 542 U.S. at 296, 301-02, 305-07, 311-12; *Apprendi*, 530 U.S. at 476-77; *Harris*, 536

---

[58]Any concerns about the practicality of requiring any enhancement for an uncharged crime to be based upon proof beyond a reasonable doubt is easily dispelled. Since *Apprendi*, federal and state courts have relied upon jury interrogatories or relied upon a bifurcated trial to establish facts relevant to certain sentencing enhancements under the advisory Guidelines. *See Cunningham v. California*, No. 05-6551, 2007 WL 135687, at *15 (Jan. 22, 2007). Moreover, inasmuch as the vast majority of cases are disposed of by guilty pleas, the plea colloquy can simply be augmented to have the defendant knowingly and intelligently waive the right to require proof of certain facts constituting an uncharged enhancing crime beyond a reasonable doubt.

126

U.S. at 556-68 (plurality opinion)). My colleagues then favor us with the following "simple syllogism":

> A crime is defined as conduct that is punishable by the state. Conduct is punishable by the state when it exposes the individual to new or additional penalties. Therefore, any conduct that exposes an individual to punishment or increases the maximum punishment to which he or she is otherwise exposed must be deemed a crime. The predicate facts of such conduct constitute the "elements" of the "crime."

Maj. Op., *supra*, at 11 (citing *Apprendi*, 530 U.S. at 483).

My colleagues read *Harris*, *Apprendi*, and *McMillan* to mean that once a charged offense has been admitted or established by proof beyond a reasonable doubt, the defendant "has no grounds to complain when the maximum punishment authorized by the legislature is meted out by a judge." Maj. Op., *supra*, at 12 (citing *Blakely,* 542 U.S. at 304-05, 309; *Harris*, 536 U.S. at 556-68). Before *Blakely,* one could hardly have disagreed. However, as I noted at the outset, *Blakely* explains that the jury's verdict does not expose the defendant to the maximum punishment "authorized by the legislature." Rather, the jury's verdict exposes the defendant to the maximum punishment that can be imposed "*solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely,* 542 U.S. at 303 (emphasis in original).

Moreover, the majority refuses to recognize that its holding contradicts longstanding Fifth Amendment principles by ignoring the risk of erroneously setting the sentencing range too

127

high based upon consideration of an uncharged *crime* during the sentencing process. *See* Dis. Op., *supra,* at 75-77 (discussing the rationale for requiring proof beyond a reasonable doubt where a criminal defendant's liberty is at jeopardy). That risk is reduced to constitutionally acceptable levels when a sentencing range is established by factoring in crimes for which the defendant has been convicted. That is the defendant's criminal history. The convictions comprising that history have been established by proof beyond a reasonable doubt, and the defendant has been afforded the full panoply of constitutional rights that comprise the "bulwark" that safeguards him/her from the power of the state. Considering crimes that rest only upon a preponderance of the evidence is different.

This is more than a technical distinction based on splitting jurisprudential hairs. As *Apprendi* teaches, "the relevant inquiry is one not of form, but of effect—does the required finding . . . expose the defendant to a greater punishment than that authorized by the jury's verdict?" *Apprendi*, 530 U.S. at 494. Requiring certainty beyond a reasonable doubt of such crimes is "not motivated by [Fifth] Amendment formalism, but by the need to preserve [Fifth] Amendment substance." *Booker*, 543 U.S. at 237 (referring to the Sixth Amendment).

As we see from the sentencing calculation here, the distinction has a definite impact under § 3553(a) in those few instances where the Guidelines require the sentencing court to set a Guideline range based upon the commission of an uncharged crime. Unless that crime is admitted or established by proof beyond a reasonable doubt, the defendant is being punished for committing a crime the existence of which lacks

128

the certainty required by the Fifth Amendment. Thus, "sentencing factors" are silently transformed into "elements" of uncharged crimes. Although sentencing judges remain free to consider any and all *conduct*, just as they always have, the Government can not punish for a crime without establishing that crime to the level of certainty required under the Fifth Amendment. This restriction is required to "give intelligible content to the right of [due process]. That right is no mere procedural formality, but a fundamental reservation of power in our constitutional structure." *Blakely*, 542 U.S. at 305-06.

## II.

Judge Ambro believes that finding a Fifth Amendment violation here is "incompatible with the Supreme Court's ruling in *United States v. Watts*." Con. Op., *supra*, at 60 (Ambro, J. concurring). I disagree. Although I agree that the Court's holding in *Watts* is at first difficult to reconcile with concluding that Grier's Fifth Amendment right to due process was violated, *Watts* does not preclude that result.

In *Watts*, police discovered crack cocaine and two loaded guns in Watts's house. The government charged him with possessing crack with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and with using a firearm in relation to a drug offense in violation of § 18 U.S.C. § 924(c). A jury convicted Watts on the drug charge, but acquitted him of the gun charge. Nonetheless, the sentencing judge enhanced Watts's sentence based on its finding by a preponderance of the evidence that he possessed the guns during the offense of conviction. The Court of Appeals for the Ninth Circuit overturned the sentence. That court held: "a sentencing judge may not, under any standard of

129

proof, rely on facts of which the defendant was acquitted" without violating the Fifth Amendment's Double Jeopardy Clause. *Watts*, 519 U.S. at 149-150 (quotations omitted).

The Supreme Court overruled the appellate court. The Supreme Court held that sentencing judges may consider conduct underlying charges the defendant has been acquitted of to enhance his/her sentence without violating his/her constitutional rights. *Id.* at 156. It is of particular relevance to our inquiry that the *Watts* Court noted that 18 U.S.C. § 3661 and U.S.S.G. § 1B1.3 work in tandem to reinforce "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information," *Watts*, 519 U.S. at 151, in selecting an appropriate sentence. *See id.* at 151-54. The Court cited *McMillan* for the proposition that "application of the preponderance standard at sentencing generally satisfies due process." *Id.* at 156. The Court explained that "an acquittal in a criminal case does not preclude the Government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." *Id.* at 156 (quoting *Dowling v. United States*, 493 U.S. 342, 349 (1990)).

*Watts* is distinguishable from the instant case because, as I have explained, Grier's enhancement was based upon the sentencing judge's finding that his conduct constituted a separate *crime* under Pennsylvania law; it was not based on the conduct alone. *Watts* reinforces the fact that sentencing judges have historically relied upon a virtually boundless universe of facts regarding the offender and the nature of the offense of conviction to inform discretion and select an appropriate sentence. Accordingly, the Court's decision in *Watts* approving a sentencing enhancement based on a defendant's possession of

130

a gun—even in the face of the jury's acquittal of possessing it *in connection with* a controlled substance violation—can be understood as being rooted in the Court's traditional understanding of the kind of facts judges consider in crafting an appropriate sentence. However, neither that traditional understanding nor the Constitution allow enhancement of a sentence based on a sentencing judge's finding by a preponderance of evidence that a defendant is guilty of another crime.[59]

---

[59]Judge Ambro accurately notes that *Watts* has faced almost "unrelenting challenge." Con. Op., *supra*, at 60 (Ambro, J. concurring). Indeed, since *Watts* was decided in 1997, only once has a majority of the Supreme Court cited *Watts* in developing its jurisprudence with respect to the Sixth Amendment's Jury Trial Clause. In *Booker*, the Court mentioned *Watts* only to distinguish it as "present[ing] a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause." *Booker*, 542 U.S. at 240 n.4. Moreover, the Court noted that *Watts* "did not even have the benefit of full briefing or oral argument." *Id.*

Likewise, the *Booker* Court distinguished *United States v. Witte*, 515 U.S. 389 (1995), where it held that the Double Jeopardy Clause did not preclude prosecution for conduct that was the basis for an enhancement of the defendant's sentence in a previous case because "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted. Rather, the defendant is 'punished only for the fact that the present offense was carried out in a

As I noted earlier, "*Booker* did not address the applicability of the right to proof beyond a reasonable doubt in the advisory Guidelines system[,]" because it had no reason to. Maj. Op., *supra*, at 17. However, *Booker's* silence on the issue is not a proclamation that the Fifth Amendment can never require proof beyond a reasonable doubt at sentencing.[60] Indeed, the Supreme Court has suggested the contrary, and we have also expressed concerns about such a narrow interpretation of the Fifth Amendment.

III.

"It was in *McMillan v. Pennsylvania* that [the Supreme] Court, for the first time, coined the term 'sentencing factor' to refer to a fact that was not found by a jury but that could affect the sentence imposed by the judge." *Apprendi*, 530 U.S. at 485 (citation omitted). *McMillan* was also the advent of the "tail which wags the dog" metaphor, which we amplified in *United States v. Kikumura*, 918 F.2d 1084 (3d Cir. 1990).[61] *See* Con.

---

manner that warrants increased punishment.'" *Watts*, 519 U.S. at 155 (quoting *Witte*, 515 U.S. at 403).

[60]I share the dismay expressed by Judges Sloviter and Ambro: "'Can the majority really be suggesting that the Due Process Clause . . . is never applicable to any sentencing issue?'" Con. Op., *supra*, at 52 (quoting Dis. Op., *supra*, at 84) (Ambro, J. concurring).

[61]*See McMillan*, 477 U.S. at 88 (explaining that Pennsylvania's mandatory minimum law did not vest in the state

132

Op., *supra*, at 54-58 (Ambro, J. concurring); Maj. Op., *supra*, at 24 n.8. The metaphor resulted from our concern that a sentencing factor that dramatically increased one's sentence should rest on more than a preponderance of the evidence. Although we did not articulate it in *Kikumura*, that concern was clearly a manifestation of the traditional interest in mitigating the risk of error that is incorporated into the Fifth Amendment by the guarantee of a heightened standard of proof. *See* Dis. Op., *supra*, at 75-77.

I share Judge Ambro's concern about the ease with which the majority questions the continued vitality of our analysis in *Kikumura*. The concern recognized in *Kikumura* that a heightened standard of proof is appropriate when the sentencing procedure becomes the "tail which wagged the dog" still lurks within the interstices of the advisory Guidelines that must be applied after *Booker.* However, even though that elusive measure allows sentencing judges to identify some situations where the Fifth Amendment requires a heightened standard of proof, it will not sniff out all such cases.[62]

---

legislature unchecked authority to redefine crimes because, among other reasons, "[t]he statute gives no impression of having been tailored to permit the visible possession finding to be a tail which wags the dog of the substantive offense.").

[62]It is, indeed, as Judge Ambro notes, odd that the majority is able to confidently conclude that the Supreme Court could not have intended to upset twenty years of practice that has governed sentencings since the advent of the Guidelines while undermining *Kikumura*, our widely-accepted precedent

133

A.

In *Kikumura*, we relied upon *McMillan*'s tail-wagging-doggie metaphor in stating: "[where] the magnitude of a contemplated departure is sufficiently great . . . the factfinding underlying that departure must be established at least by clear and convincing evidence." *Kikumura,* 918 F.2d at 1101. As Judge Ambro notes, we did not require proof beyond a reasonable doubt because the defendant only argued for a standard of clear and convincing evidence. Con. Op., *supra*, at 54 n.25 (citing *Kikumura*, 918 F.2d at 1101) (Ambro, J. concurring). Thus, under *Kikumura*, the applicable standard of proof under the Fifth Amendment turns on the differential between the sentence a defendant would have received absent certain findings of fact, and the proposed sentence that will be imposed based on those additional findings. At some point, that differential becomes too disproportionate to the unenhanced sentence to allow the increase to rest only on a preponderance of the evidence.

However, there is no way to identify those situations consistently. In *Kikumura*, we explained:

> if proof by a mere preponderance is sufficient to
> justify a two-level increase for willfully impeding
> an investigation . . . then proof by that identical

that affirms a heightened standard of proof at sentencing under the Fifth Amendment depending on the impact of a sentencing enhancement. *See* Con. Op., *supra*, at 57 (Ambro, J. concurring).

134

> standard is also appropriate in order to justify, for example, a four-level increase for organizing an offense . . . or a six-level increase for unlawfully receiving explosives that one knows to be stolen . . . or probably even a ten-level increase for distributing those explosives to a fugitive from justice.

*Id*. at 1100 (quotations omitted). We were concerned in *Kikumura* because the enhancement there raised the defendant's exposure "from about 30 months to 30 years—the equivalent of a 22-level increase in his offense level." *Id*. at 1100. Accordingly, we can conclude with some confidence that the existence of sentencing factors that result in that large an increase in a sentencing range is of sufficient gravamen to start Rex "awaggin." Similarly, we can confidently conclude that an increase of one or two levels will not have much of an impact on our metaphorical mastiff. But where do we draw the line?

The extremes are easy. But how do we construct any kind of consistent jurisprudence that sentencing courts can apply in the overwhelming majority of cases that cluster away from the polar extremes? Justice Scalia addresses just such a dilemma in *Blakely*.

## B.

In discussing the application of the Sixth Amendment in *Blakely*, Justice Scalia noted that legislatures could "establish legally essential sentencing factors *within limits*" that would be crossed "when, perhaps, the sentencing factor is a 'tail which wags the dog of the substantive offense.'" *Blakely,* 542 U.S. at 307 (quoting *McMillan,* 477 U.S. at 88) (emphasis in original).

135

Under such a sentencing scheme, the Sixth Amendment guarantee of a jury trial would be triggered when the law went "*too far*[,]" and "exceed[ed] the judicial estimation of the proper role of the judge." *Id.* (emphasis in original). Applying *Kikumura* to that scenario, we could draw upon *Blakely* to conclude that a heightened standard of proof is required when the law goes too far; i.e., when the increase in the sentencing range becomes "too" disproportionate to the pre-enhancement range. However, there, just as with the protection guaranteed under the Sixth Amendment, "[t]here is no answer that legal analysis can provide. With *too far* as the yardstick, it is always possible to disagree with such judgments and never to refute them." *Blakely,* 542 U.S. at 308 (emphasis in original).

Thus, in the vast majority of cases gathered somewhere in the middle, away from the extreme that concerned us in *Kikumura*, it is possible for an appellate court to conclude that a heightened standard of proof is required, yet never be able to refute the trial court's failure to require it. When sentencing factors result in increases that are neither extreme, nor "*de minimis*," such a standard ceases being a workable "standard" at all. Rather, it is merely an expression of the individual sentencing judge's subjective sense of fairness.

In *In Re Winship*, the Court traced the long history of the reasonable doubt standard, noting that it "dates at least from our early years as a Nation." 397 U.S. at 361. There, the Court observed that any "society that values the good name and freedom of every individual should not condemn a man for commission of a crime when there is a reasonable doubt about his guilt." *Id.* at 363-64. That statement applies with equal force to a sentencing that rests, in large part, upon the

136

commission of a crime that has only been established by a preponderance of the evidence.

*Kikumura* is an example of the constitutional tension that is created under the Fifth Amendment when liberty is placed on such a precarious perch. Left only to the proportionality calculus of the tail wagging the dog, we would have to conclude "that the Framers . . . have left definition of the scope of [the Fifth Amendment] up to judge's intuitive sense of how far is *too far*." *Blakely*, 542 U.S. at 308 (emphasis in original).

Yet, *Kikumura*'s doggie test tolerates this result in the vast majority of cases because the increase in the sentencing range will not be sufficiently disproportionate in the sentencing judge's mind to require a heightened standard of proof.

Although such cases do not present the extreme deprivation of liberty so apparent in *Kikumura*, they nevertheless result in a deprivation of liberty. I am not as anxious as my colleagues in the majority to conclude that a society that proclaims the importance of liberty can so easily tolerate a sentencing procedure that creates the risk of incarcerating someone for an uncharged crime despite a reasonable doubt about his/her guilt.

## C.

The cases Judge Ambro relies upon show the difficulty of applying the doggie metaphor. *See* Con. Op., *supra*, at 55 n.26 (Ambro, J. concurring). For example, in *United States v. Mack*, 229 F.3d 226, 232-35 (3d Cir. 2000), a 39% increase in the Guideline range and a 12% increase in the actual sentence was not viewed as a sufficient enhancement to trigger a

137

heightened standard for fact finding. However, it is not difficult to conceive of other sentencing courts that would be very uncomfortable allowing a 12% increase in the length of incarceration based only upon a finding that the defendant probably committed an uncharged crime.

*United States v. Lombard*, 72 F.3d 170 (1st Cir. 1995), another of Judge Ambro's examples, illustrates why the Court of Appeals for the First Circuit relied upon the doggie metaphor to conclude that a federal firearms prosecution was merely a subterfuge to sentence the defendant for murders he had been acquitted of. *See* Con. Op., *supra*, at 61-63 (Ambro, J. concurring).

If the Fifth Amendment requires a heightened standard of proof before an uncharged crime can be used to enhance a defendant's sentence, that protection applies whether the sentencing judge considers the increase "significant" or "insignificant." Any increase in the term of imprisonment is surely significant to the person who serves the sentence, and I believe it should also be viewed as significant by the society that incarcerates him/her. The Supreme Court has reminded us that "[a] single day in prison may be unconstitutional in some circumstances." *See Solem*, 463 U.S. at 290 (citing *Robinson v. California*, 370 U.S. 660, 667 (1962)). The constitutional evil is not the duration of the constitutional deprivation, it is the fact of it.

Although a criminal conviction certainly reduces a defendant's constitutional rights, it does not jettison all of the protections embodied in the Constitution. That is evident from a long line of cases that predate *In re Winship* and extend to

138

*Apprendi* and its progeny. *See, e.g.*, *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (holding that absence of counsel during sentencing, coupled with prejudice, violated the Sixth Amendment guarantee of counsel).

Nor does an inquiry into whether "the primary conduct for which [the defendant] is being punished[,]" resolve the Fifth Amendment problem. *See* Con. Op., *supra*, at 63 (quoting *United States v. Mobley*, 956 F.2d 450, 459 (3d Cir. 1992)) (emphasis omitted) (Ambro, J. concurring). Accordingly, I do not share Judge Ambro's view of the congruence between *Mobley* and the position espoused by the majority. I agree with Judge Sloviter's explanation of why the decision in *Mobley* offers little support for the majority's analysis. *See* Dis. Op., *supra*, at 82-83. In addition, I note that *Mobley* came twelve years before the Court defined "statutory maximum" in *Blakely*, for purposes of the Guidelines. Moreover, *Mobley*, like *Watts*, *Harris* and *McMillan,* involved sentencing for *conduct*; it did not inquire into the constitutionality of basing a sentence on an uncharged crime.

Exposing a defendant to punishment for a crime based only upon facts that are treated as elements of an uncharged offense creates the very real danger of establishing a "shadow criminal code," just as Judge Ambro states. See Con. Op., *supra*, at 40 (Ambro, J. concurring). The reality of the sentencing process and the Fifth Amendment dictates demarcation between using circumstances as sentencing factors, and using them as elements of an uncharged crime. The "bright-line rule" of *Apprendi*, requires that we construct that divide in a manner that maintains the traditional distinction between sentencing factors and factors that operate as elements of

139

uncharged crimes using the Fifth Amendment as our straight-edge.

Thus, although I agree with Judge Ambro that it is not necessary to disturb the reasoning of *Kikumura*, the *Kikumura* calculus is of little assistance in determining when the Fifth Amendment requires a heightened standard of proof here, and in the vast majority of cases. Nevertheless, even that test is better than the sentencing procedure legitimized by the majority, as that standard allows little if any room for the operation of the Fifth Amendment in the all-important sentencing context.[63]

## IV.

Like Judge Sloviter, I also think that the Supreme Court's recent decision in *Cunningham v. California*, 2007 WL 135687, is relevant to the Fifth Amendment question raised here. That case is addressed in Judge Sloviter's dissent. *See* Dis. Op., *supra*, at 74, 78, 91-92, 95-97. However, at the risk of redundancy, it may be helpful to elaborate briefly.

The defendant in *Cunningham* was convicted of continuous sexual abuse of a child under the age of 14, and sentenced pursuant to California's determinate sentencing law ("DSL"). The DSL provided for three different terms of imprisonment following conviction depending on the existence of aggravating or mitigating factors found by the sentencing

---

[63]I think it fair to conclude that both the defendant and the Government will usually care more about the sentence that is imposed than the offense the defendant is convicted of.

140

court.[64]  In addition to the aggravating factors, which allowed a sentencing court to impose a sentence other than the middle range, the sentencing scheme also allowed for a sentence "above an upper term based on specified statutory enhancements relating to the defendant's criminal history or circumstances of the crime. [However,] [u]nlike aggravating circumstances, statutory enhancements [had to] be charged in the indictment, and the underlying facts [had to] be proved to the jury beyond a reasonable doubt."  2007 WL 135687, at *7 (citing Cal. Penal Code Ann. § 1170.1(e)).

---

[64]Specifically, the relevant section provides:

Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense, as defined in subdivision (b) of Section 1203.066 or three or more acts of lewd or lascivious conduct, as defined in section 288 with a child under the age of 14 years at the time of the commission of the offense is guilty of the offense of continuous sexual abuse of a child and shall be punished by imprisonment in the state prison for a term of 6, 12, or 16 years.

Cal. Penal Code Ann. § 288.5(a) (West 1999).  *See also* Cal. Penal Code Ann. § 667 *et seq*. (West Supp. 2006) (setting forth the bases for enhancement).

Following his conviction, Cunningham could have been sentenced to a lower term of six years, a middle term of 12 years, or an upper term of 16 years. California law required that the middle term of 12 years be imposed unless the sentencing judge found circumstances in aggravation or mitigation. Following a sentencing hearing, the judge found six aggravating factors and one mitigating factor by a preponderance of the evidence. The aggravating factors included the vulnerability of the victim and Cunningham's violent conduct. The only mitigating factor was the absence of a prior criminal record.[65] In concluding that these factors had been established by a preponderance of the evidence, the sentencing court relied upon several factors including "the trial record; probation officer's report; statements and aggravation or mitigation submitted by the parties, the victim, or the victim's family, 'and any further evidence introduced at the sentencing hearing.'" 2007 WL135687, at *5 (quoting *People v. Black*, 113 P.3d 534, 538 (Cal. 2005)).

---

[65]Not surprisingly, as I noted above, these are the kind of traditional sentencing factors that judges have historically considered, with or without guidelines. They are included within the considerations codified at 18 U.S.C. § 3553(a). See 18 U.S.C. § 3553(a)(1) (providing that "the nature and circumstances of the offense and the history and characteristics of the defendant" should be considered when imposing sentence). The absence of prior record is incorporated into the Guidelines through the Criminal History Category component of the calculation. U.S.S.G. § 4A1.1; 18 U.S.C. § 3553(a)(4)(A).

142

The defendant challenged the sentencing scheme, arguing that it could not survive the Court's decision in *Booker*. In discussing the challenged DSL, the Supreme Court noted that the California Supreme Court had upheld that sentencing scheme against a *Booker*-premised constitutional challenge on several grounds. The California Supreme Court had acknowledged the DSL appeared in tension with the rule of *Apprendi* on its surface. However, that court concluded that California's scheme was not in tension with *Apprendi* "in 'operation and effect.'" 2007 WL 135687, at *11 (quoting *Black*, 113 P.3d at 543). The California court reached that conclusion by reasoning that the "DSL 'simply authorizes a sentencing court to engage in a type of factfinding that traditionally has been incident to the judge's selection of an appropriate sentence within a statutorily prescribed sentencing range.'" 2007 WL 135687, at *11 (quoting *Black*, 113 P.3d at 543). The California court surmised that the statutory maximum remained the upper limit to which the defendant could be sentenced following his conviction, "'and a trial court's imposition of an upper term sentence does not violate a defendant's right to a jury trial under the principles set forth in *Apprendi, Blakely,* and *Booker*.'" 2007 WL 135687, at *11 (quoting *Black*, 113 P.3d at 543). Rejecting the California Supreme Court's analysis, the Supreme Court explained:

> We cautioned in *Blakely*, however that broad discretion to decide what facts may support an enhanced sentence, or to determine whether an enhanced sentence is warranted in any particular case, does not shield a sentencing system from the force of our decisions. If the jury's verdict alone

143

> does not authorize the sentence, if, instead, the
> judge must find an additional fact to impose the
> longer term, the Sixth Amendment requirement is
> not satisfied.

2007 WL 135687, at *12 (citing *Blakely*, 542 U.S. at 305 ).

I agree that the federal Guidelines are distinguishable from the sentencing scheme in *Cunningham* because the post-*Booker* guidelines do not *require* the sentencing judge to impose a given sentence absent additional findings of fact, as was the case with the DSL. Indeed, this is no doubt the distinction that the majority and the concurrences rely upon in suggesting that a preponderance of the evidence standard is all that is required here. *See* Maj. Op., *supra*, at 18 n.6; *see also* Con. Op., *supra*, at 36 (Rendell, J. concurring); Con. Op., *supra*, at 50 n.24 (Ambro, J. concurring). However, as Judge Sloviter's discussion of *Cunningham* suggests, this distinction is without a constitutional difference.

At the risk of belaboring the point, I think it important to reemphasize that Grier's sentence did not result from the exercise of discretion based only upon facts established beyond a reasonable doubt. Rather, his sentence is based upon a finding by a preponderance of the evidence that he committed aggravated assault. That finding of fact (i.e., conclusion of law) did not flow from his guilty plea, yet it exposed him to an increased sentence.

Thus, even though my colleagues maintain that Grier's sentence resulted from the appropriate exercise of judicial discretion within a defined range, as authorized in *Booker*, 543 U.S. at 233, it is not that simple given *Blakely*'s definition of

144

"statutory maximum" and the operation of U.S.S.G. § 2K2.1(b)(5).

V.

For the foregoing reasons, I respectfully dissent from the the majority opinion. Likewise, I can not join Judge Ambro's concurring opinion, primarily, because he suggests a rule that would require the protections of the Fifth and Sixth Amendments for the finding of "every fact (save prior convictions) identified by the law itself as deserving of additional punishment, no matter what that fact may be called." He believes that "[o]nly in this way [will] the principles of *Apprendi*—followed through in *Blakely*, *Booker*, and, most recently, *Cunningham*—be fully respected." Con. Op., *supra*, at 39-40 (footnote omitted) (Ambro, J. concurring). However, such a rule would draw an artificial distinction between those factors which judges must consider to fashion an appropriate sentence—factors they have considered since "time out of mind"—and those factors which the legislature may appropriately require the judge to consider in imposing sentence in a given instance. Yet, in practice, those two sets of factors will always substantially overlap if they are not identical. An examination of § 3553(a) illustrates this. Legislators and judges will usually agree on factors which common-sense and social responsibility require be considered at sentencing. Rather, the distinction must be based upon the traditional concept of due process that forbids punishing someone for a crime in the absence of sufficient proof to justify the punishment.

Accordingly, I respectfully dissent from the majority opinion, and instead join Judge Sloviter in dissent.

145